Syllabus.

# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## WASHINGTON AND OLD DOMINION RAILWAY COMPANY V. ZELL'S ADMINISTRATOR.

### March 16, 1915.

### Absent, Keith, P.

1. PLEADING—*Contributory Negligence—Railroads—Grade Crossing.*— Whether or not a traveler crossing a railroad at grade was guilty of contributory negligence in not looking for approaching trains before attempting to cross is a matter of defense, which, in an action by him for any injury at such crossing, he is not required to negative or anticipate in his pleading or proof. But if the rule were otherwise, the declaration in the case at bar is sufficient, because it alleges that the plaintiff's intestate was "without any negligence on his part."

2. RAILROADS—*Grade Crossing—Rights and Duties of Travelers on Highway.*—At grade crossings of railroads the rights of a traveler on the highway and of the railroad company are "mutual, reciprocal and co-extensive," but generally a moving train is accorded the right of way. A traveler approaching such crossing for the purpose of crossing must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of the prior right of passage would be expected to exercise. The duty of looking and listening for approaching trains must be discharged in such manner as will make the looking and listening effective. The greater the danger, the greater the measure of duty. The track itself is a proclamation of danger, and the traveler has no right to proceed across the track without such looking and listening for approaching trains, and if he does, and in consequence thereof is injured, there can be no recovery, although the railroad company may also be guilty of negligence proximately contributing to such injury.

3. RAILROADS—*Grade Crossing—Drivers of Automobiles—Negligence.*— Drivers of automobiles are held to a higher degree of caution in crossing railroads at grade than drivers of wagons and other vehicles drawn by horses. If they cannot otherwise see or hear, they must stop, look and listen even in close proximity to the

track, and if they fail to do so, and make chance, not stopping, their guaranty of safety, and are injured by moving trains, they cannot recover.   Although it may sometimes afterwards appear that it would have been safer not to have stopped, still if men choose to act upon chance instead of caution in such cases, they violate a general rule of safety established by reason, experience and authority, and are guilty of negligence which will bar recovery.

4.   AUTOMOBILES—*Negligence of Driver—Joint Enterprise.*—Where two persons are engaged in a joint enterprise or adventure in the use of an automobile, even though the enterprise or adventure be only a pleasure trip, the contributory negligence of either, within the scope of the enterprise, will bar a recovery by the other.

Error to a judgment of the Circuit Court of Alexandria county in an action of trespass on the case.   Judgment for the plaintiff.   Defendant assigns error.

*Reversed.*

The opinion states the case.

*C. E. Nichol* and *W. J. Lambert,* for the plaintiff in error.

*John M. Johnson* and *Crandall Mackey,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

Ernest Zell was killed on a highway crossing when an automobile in which he was riding was struck by a passenger train owned and operated by the Washington and Old Dominion Railway.   His administratrix brought this action and recovered the judgment under review.

There was a demurrer to the declaration, which was overruled by the circuit court, and that action, though earnestly complained of, was plainly right.   The ground of the demurrer was the failure to allege that either Zell or Peck, the driver and only other occupant of the automobile, looked and listened for a train before attempting to cross the track.   This was a matter of defense which the plaintiff was not required to

negative or anticipate in his pleading or proof. *Interstate R. Co.* v. *Tyree,* 110 Va. 38, 40, 65 S. E. 500; *U. S. Spruce Lumber Co.* v. *Shumate, ante,* p. 471, 87 S. E. 723. But if the rule were otherwise, the declaration would be sufficient in this respect because it does allege that the plaintiff's intestate was "without any negligence on his part." *Danville* v. *Thornton,* 110 Va. 541, 550, 66 S. E. 839, 842.

At the trial the defendant demurred to the evidence, but the court overruled the same and entered up judgment for the plaintiff upon the conditional verdict of the jury. This action constitutes the basis of the only other assignment of error.

Zell and Peck, both residents of Alexandria, were intimate friends and associates. Peck owned an automobile in which he and Zell frequently went out together on pleasure trips. Both were familiar with the machine, and were competent drivers. When out together they would sometimes, even on the run, take turn about at the wheel. Zell frequently drove the car when Peck was along, and seems to have been the man who always got it out and ready for a trip. It was not unusual for them to go to Washington together on Sunday, and they were on such a trip when they met their death in the collision above mentioned.

On Saturday night before the Sunday morning of the accident, Peck, who kept a grocery store, left his place about 9:30 o'clock in his car and in company with Zell. Where they went or what they did between that hour and some time next morning does not appear. The witness, Leachman, who worked at the store and stayed with Peck, retired about 11 o'clock, and the latter had not then returned, but he did come in and go to bed some time during the night. At 9:30 next morning Zell came around and waked Peck and Leachman, asked if they were going to sleep all day, and then went out, got the machine from its place and was fixing and cleaning it up while Peck dressed and got his breakfast, which he did in very few

minutes.  He and Zell then immediately started off in the car, Peck at the wheel.  Leachman says that he does not know anything about their plans on this occasion, except that "they had made some arrangements to go out."  The declaration avers that they intended to go to Washington, and they were next seen, so far as the evidence shows, about one and a half miles from Alexandria going northward, and approaching the intersection of Mount Vernon avenue with the track of the defendant company.  This point is known as Hume's crossing and is outside of the city in Alexandria county, but it is a crossing much used both by vehicles on the highway and by trains running between Alexandria and Bluemont Junction.  In coming from Bluemont Junction to Alexandria the trains run backwards, that is, with the cars in front, the engine moving backwards.  This practice has been carried on for years, and this accident appears to have been the first of the kind on that line. The train, an engine and tender and one combination passenger and baggage car, was running in this manner going east towards Alexandria when the collision occurred.

This was a dangerous crossing for travelers coming, as these two men were, from the south, because on that side of the track and west of the highway there was a natural embankment or hill which obstructed the view from the highway of the track and *vice versa.*  Various estimates, not purporting to be based upon actual measurements or to be absolutely accurate, appear in the record as to the extent and effect of this obstruction, but the question is set at rest by the results of undisputed tests and measurements made by a photographer assisted by an engineer. These tests and measurements, construed most strongly against the defendant, demonstrate that the driver of an automobile, coming north on the highway, could in a perfectly safe and ample stopping distance of the track see a train approaching from the west at a distance of at least seventy-five feet from the crossing.  As he drew nearer the track he could see the train still further west, the track in that direction being straight for

several hundred feet. The maximum rate at which any witness placed the speed of the train was "between 25 and 30 miles an hour." This same witness, the only eye-witness who testified, and who was in a position to see both the train and the automobile and "just stopped and waited to see which would cross first," said that the automobile approached the crossing at about fifteen miles an hour, and slowed down just before reaching it to a speed of from ten to twelve miles, the impression made on him being that the machine slowed down to avoid the jar which would result from running at a faster rate over the crossing.

A number of grounds of negligence on the part of the railway company are charged in the declaration, chief among which are excessive speed, failure to give the statutory signals for the crossing, running the train backward, failure to keep a lookout for the crossing, and want of proper equipment. It is earnestly contended on behalf of the company that the plaintiff wholly failed to establish any of these grounds. But conceding that there was evidence tending to show negligence on the part of the defendant there can be no recovery by the plaintiff for the reasons hereinafter stated.

The negligence of the driver of the car is perfectly manifest. He had no right to proceed across the track without looking and listening for a train. The greater the danger the greater was the measure of his duty. If he did not see or hear a train when he first reached the point at which the obstruction began to pass from his westward vision along the track, then it was his duty to continue to look and listen until he reached the track. The very contention made here that he had to be close to the track before he could see any distance to the west emphasizes the importance of caution on his part. If the running of his machine interfered with his hearing or looking, it was his duty to stop and look and listen so as to make looking and listening effective.

Travelers approaching a public crossing must bear in mind

that, while their rights and those of the railroad company at that point are "mutual, reciprocal and coextensive" in general, the law has always accorded, and in the nature of the case must accord, to a moving train the right of way. *Southern Ry. Co.* v. *Torian,* 95 Va. 454, 28 S. E. 569; Elliott on Roads and Streets (3d Ed), sec. 1021, and cases cited in note 77; *Continental Imp. Co.* v. *Stead,* 95 U. S. 161, 24 L. Ed. 403. A failure on the part of the railroad company to give proper warning or other lack of ordinary care will render the company liable if its negligence is the proximate cause of an injury at a crossing and the injured party is without fault, "but the track itself is a warning of danger and a traveler must always exercise care proportionate to the known danger, and this care must be such as one who knows the danger and is aware of the prior right of passage would be expected to exercise." 3 Elliott on Railroads (1897), and cases cited in notes 1 and 3.

In the latest reported crossing case decided by this court, *U. S. Spruce Lumber Co.* v. *Shumate,* cited *supra,* Judge Cardwell, who delivered the opinion, citing a number of authorities, said: "This court has repeatedly held that the duty of looking and listening for approaching trains before crossing a railroad track must be discharged in a way to make looking or listening effectual." The entire opinion in that case is in point here, for it shows that under the allegations of the declaration there, as under the evidence here, if all the negligence charged against the defendant be taken as true, the accident could not have occurred without the contributing and concurring negligence of the plaintiff. The case at bar is even a stronger one against the right of recovery than the *Shumate Case,* because the plaintiff there was riding in a horse-drawn vehicle, and, as we shall see, the authorities hold automobile drivers at crossings to a higher degree of caution than drivers of wagons and other vehicles drawn by horses.

In *Chase* v. *N. Y. Cent., &c. R. Co.,* 208 Mass. 137, 94 N. E. 377, the court said: "The rules of law applicable to the

driver of a horse-drawn vehicle approaching a railway crossing have been laid down in many cases. He must look and listen in a reasonable way, so as if possible to secure his safety. The proper application of this rule for one driving an automobile is simple, and in concrete cases far less difficult than for the driver of horses. . . . If his machine is a good one, it can be controlled easily and perfectly, and there is no danger from it if he stops to look and listen within six feet of the track."

This authority is directly applicable to the present case. It affirmatively appears that either of the occupants of the car could stop it very quickly. They approached this dangerous grade crossing, with which they were both familiar, at fifteen miles per hour, and, with what the witness thought was only a slight reduction of speed to avoid the jar in riding rapidly over the track, ran on to the crossing at the rate of from ten to twelve miles an hour. If, as was suggested in the opinion of the Massachusetts court above, they had stopped in six feet of the crossing, as they could safely and easily have done, they would beyond any possible doubt have seen and heard the train before starting their car again. Indeed, even as it was, and without any stop on their part, the train was necessarily within the range of their vision before they reached the track, since otherwise, at a rate of not over thirty miles per hour, it could not possibly have overtaken them.

In the well-considered case of *New York C. & H. R. R. Co. v. Maidment* (U. S. Circuit Court of Appeals), 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794, the court said: "With the coming into use of the automobile new questions as to the reciprocal rights and duties of the public and that vehicle have arisen and will continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive, followed by a heavy train, is subjected to slight danger by a crossing foot passenger or a span of

horses and a vehicle, but when the passing vehicle is a ponderous steel machine, it threatens not only the safety of its own occupants but also those on the colliding train. And when, to the perfect control of such a machine, is added the factor of high speed, the temptation to dart over the track at a terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject. He cannot drive close to the track or stop there without risk of his horses frightening, shying, or overturning the vehicle. He cannot well leave his horses standing and if he goes forward to the track to get an unobstructed view and look for coming trains, he might have to lead his horse or team with him. Those precautions the automobile driver can take carefully and deliberately and without the nervousness contributed by a frightened horse. It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety with less inconvenience, no danger and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public. If the law demands such care, and those crossing make such care, and not chance their protection, the possibilities of the automobile crossing accidents will be minimized."

In *Brommer* v. *Penn. R. Co.* (U. S. Circuit Court of Appeals), 179 Fed. 577, 103 C. C. A. 135, 29 L. R. A. (N. S.) 924, the court, quoting the above language from the *Maidment Case,* says further: "This rule is conducive to safety and observation and experience have deepened our conviction of its sound-

ness. We, therefore, adhere to it and restate it, and the court below was clearly right in holding that it was conclusive of this case. Here, as there, the driver of the machine, when stopping and looking and listening would have prevented the accident, made chance, not stopping, the guaranty of his safety. The plaintiff in error, Brommer, was clearly guilty of contributory negligence and the court rightly gave binding instructions against him." See also *N. & W. Ry. Co.* v. *Strickler, ante,* p. 153, 86 S. E. 824; *Springs* v. *Va. R. & P. Co.,* 117 Va. 826, 86 S. E. 65; 2 R. C. L., sec. 42, p. 206, and citations; Davids Law of Motor Vehicles, sec. 180, p. 179, and cases cited; Ann. Cas. 1913B, 682, note.

In the case of *Southern Railway Co.* v. *Vaughan's Admr., ante,* p. 692, 88 S. E. 305, decided by this court today, in which a recovery is upheld in favor of the estate of an automobile driver killed at a crossing where the view was obstructed, the court instructed the jury that it was the duty of the driver to stop, look and listen, and the evidence tended to show that he did stop for that purpose in five feet of the track, but there was a deep cut and a curve in the track near the crossing, and, notwithstanding his caution, he was caught and killed. As already shown, if Peck had stopped near the track as Vaughan did, the accident in this case would have been averted. It will, of course, happen in exceptional cases, as may have been true in Vaughan's case, that going ahead without looking will afterwards prove to have been the safer course, but when men choose to act upon chance instead of caution in such cases, they violate a general rule of safety established by reason, experience and authority, and are guilty of negligence which will bar a recovery.

There are cases in which the question as to whether the traveler was guilty of negligence in going on the track without looking and listening is one for the jury. This class of cases is discussed and the distinction applicable here indicated by Judge Buchanan in *Boyd* v. *Southern Ry. Co.,* 115 Va. 11, 78 S. E.

548, Ann. Cas. 1914D, 1017, and we may well say in leaving this branch of the case as he said in concluding that discussion, "certainly there is nothing in the facts and circumstances of this case to take it out of the general rule that failure to look and listen before going on a railway crossing is *per se* negligence."

But it is claimed that the negligence of the driver, Peck, cannot be imputed to Zell. Inasmuch as they left Alexandria fifteen minutes before the accident with Peck at the wheel, it is a fair inference that he was still driving the car, but in our view of the case that fact is immaterial, because Zell's situation did not bring him within the rule applicable to invited guests or passengers as applied in *A. & D. R. Co.* v. *Ironmonger,* 95 Va. 625, 632, 29 S. E. 319, but, upon the contrary, brought him within the reason and the terms of the rule that where two persons are engaged in a joint enterprise or adventure in the use of an automobile, even though the enterprise or adventure be only a pleasure trip, the contributory negligence of either, within the scope of the enterprise, will bar a recovery by the other. In this case Zell had taken the lead that morning in the joint project in which they were engaged, and can by no reasonable intendment be classed as an invited guest or passenger in the sense in which those terms are used in the *Ironmonger Case* and the many other cases of that type, the authority of which in cases where they apply we recognize, but which are distinguishable in principle from this one.

In the second volume of Ruling Case Law, sec. 43, p. 1208, after adverting to the variety and contrariety of opinion upon the question of imputing to a passenger the negligence of a driver, the text says: "In spite of these different rules as to whether negligence may be imputed to a guest or passenger in an automobile, there seems to be no difference of opinion as to the rule that where two persons are engaged in a joint enterprise in the use of an automobile, the contributory negligence of one will bar a recovery by either, if it is a matter within the scope

of the joint undertaking." See also *Beaucage* v. *Mercer,* 206 Mass. 492, 92 N. E. 774, 138 Am. St. Rep. 401; 33 Cyc. 1015, and cases cited in note 64; Whites' Supplements (1907 and 1914) to Thompson on Neg., sec. 506.

That this rule applies to an ordinary pleasure ride would seem clear as a matter of reason, and is recognized in the authorities. "Thus in a case where two persons went out in a row boat, it was held that one of them was imputable with the contributory negligence of the other—who, with his consent, did all the rowing and had charge of the boat—in getting in front of a steamer having the right of way, so as to bar a recovery for resulting injuries." White's Supplement (1907) to Thompson on Neg., sec. 506, citing *Yarnold* v. *Bowers,* 186 Mass. 396, 71 N. E. 799. To the same effect is *Beaucage* v. *Mercer, supra.*

The undisputed evidence here presents a case of a joint adventure by Zell and Peck, and brings them both within the influence of the rule announced in the foregoing authorities.

We are of opinion that the demurrer to the evidence should have been sustained. The judgment complained of will accordingly be reversed and a judgment entered in this court for the plaintiff in error.

*Reversed.*