## Wytheville.

### John Barton Payne, Director General of Railroads, Agent, etc., v. Lorenzo D. Mason, Administrator of Samuel T. Mason, Deceased.

June 12, 1924.

Absent, West, J.

1. Negligence—*Contributory Negligence—Statement in Writing that Defendant Relies on Contributory Negligence.*—In an action against the Director General of railroads for death arising out of collision at a highway crossing the only plea interposed by the defendant was that of the general issue and the defendant filed no statement in writing showing that he relied on contributory negligence as a defense. It follows that for such defense the defendant was confined to the plaintiff's testimony.

2. Crossings—*Contributory Negligence—Case at Bar.*—In the instant case, an action for death arising out of a collision at a highway crossing, between the car of plaintiff's decedent and an engine of defendant, the evidence relied on by the defendant to support the contention that it was a case of negligence *per se* on the part of the plaintiff's intestate was even weaker than that in the case of *Davis* v. *Bowman,* 138 Va. 108, 121 S. E. 506, where it was held that as a matter of law it could not be said that the plaintiff was guilty of contributory negligence.

Error to a judgment of the Circuit Court of Accomac county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The defendant in error's intestate, Samuel T. Mason, deceased, was killed when the automobile, which he was driving and in which he was at the time, came into

collision with a train operated by the Director General over the New York, Philadelphia and Norfolk Railroad Company's tracks at a highway crossing.

The parties will be hereinafter referred to as plaintiff and defendant, in accordance with their positions in the trial court.

The plaintiff brought this action under the statute to recover damages for the death of the said intestate. There was a verdict and judgment in favor of the plaintiff, and the defendant assigns error.

There is but one assignment of error, which is, in substance, that it appears from the evidence that the plaintiff's intestate was guilty of contributory negligence *per se*, which bars the right of recovery.

The accident occurred prior to the going into effect of section 3959 of the Code, abolishing contributory negligence as a bar to recovery in cases of this character.

[1] The only plea interposed by the defendant was that of the general issue; and the defendant filed no statement in writing showing that it relied on contributory negligence as a defense; so that it follows that for such defense the defendant is confined to the plaintiff's testimony. Looking to this testimony, and including the reasonable inferences which the jury were warranted in drawing therefrom, the material facts may be stated as follows:

The accident occurred about three o'clock on the afternoon of November 22, 1919. It had been raining but at the time of the accident had stopped raining and was cloudy but not "thick." The plaintiff's intestate was the plaintiff's son, who had returned from over-sea aviation service in July preceding the accident. He was twenty-two years of age, and, as was disclosed by the evidence, "was a young man of fine intelligence." About fifteen minutes prior to the accident, he left

Makemie Park in a Ford touring car to take an old gentleman home as an act of charity, and it was upon his return, in attempting to cross the defendant's tracks, that the collision occurred. The tracks at this point are straight for a considerable distance each way and run practically north and south. The road upon which deceased was driving was the main road through Makemie Park, and crossed the defendant's tracks almost at right angles, making the road extend in a general east and west direction. The deceased's home was on the eastern side of the railroad right of way, and he was going from the west toward same at the time of the collision. The defendant's tracks were two in number, both being main tracks, the eastern track being used by north-bound trains and the western track being used by south-bound trains. The collision occurred upon the western or south-bound track.

The train that killed deceased was the south-bound passenger train from New York to Cape Charles, and on the day in question the train was running at the rate of fifty or fifty-five miles an hour in an effort to make up lost time. After the collision, parts of the Ford touring car were carried by the train for a distance of about a mile.

On the western side of the defendant's right of way and adjacent thereto, after one leaves the crossing and starts north along said right of way, there are two telegraph poles and several maples and smaller trees, the nearest one being fifteen or twenty feet from said crossing, and said trees being ten or fifteen feet apart. At a point 211 feet north of said crossing and along said right of way there commences a row of large cedars, and these cedars continue adjacent to said right of way for a distance of 575 feet. Beyond said cedars there were some smaller trees which, however, did not ob-

struct the view.    In addition to these trees, which are
adjacent to the railroad's right of way, there are two
other cedars about opposite the northern end of the
cedars in question and a few yards west thereof.

About sixty to seventy-five feet on the western side
of the railroad right of way there is a hotel owned by a
Mr. White.    This hotel is about twenty feet north of
the road over which deceased was driving and is at
least thirty feet square.    North of the hotel, and about
on a line therewith, is the home of Mr. Harry White,
said home being about 100 yards north of the county
road over which deceased was driving.    Further north
still there is a home of a Mrs. Richardson, said home
being 886 feet north of the county road in question and
seventy-two feet west of the defendant's right of way.
The defendant's whistle post is 1,111 feet north of the
crossing.    The home of Harry White is about in line
with the hotel and the home of Mrs. Richardson, being
slightly nearer to the hotel than to the home of Mrs.
Richardson.

Over on the south side of the road on which deceased
was driving there is the store of Asa G. Taylor, the
door of said store being about in line with the front or
eastern side of the hotel, said store being fourteen feet
south of the county road and the eastern side of said
store being thirty-six feet from the railroad's right of
way.    Between the store of said Taylor and the railroad
right of way is a barber shop at that time occupied by
Will Hastings.

The deceased was approaching the crossing from the
west, which placed the buildings and trees on the north
of the road on which he was traveling, on his left and
between him and the track on which the train ap-
proached, going south over the western track.    The

road that deceased was using was straight for about one-eighth of a mile west of the crossing.

It is not contended by the defendant, nor does the record intimate, that deceased could have seen the railroad track north of the highway crossing until after he passed the hotel of Mr. White. This point was ninety-five feet west of the track on which the accident occurred. His view in that direction, up to that point, was obstructed by the home of Mrs. Richardson, the home of Harry White and by said hotel, and by numerous cedars between the home of Mrs. Richardson and the home of Harry White, and by several outbuildings.

The view of the deceased of the railroad track south of the highway crossing was entirely obstructed by the said Taylor store and Hastings' barber shop from the aforesaid point ninety-five feet west of the track, until the deceased, as he sat in the touring car, had reached a point about nineteen feet from the western rail of the track on which the collision occurred—the front of the touring car being then within about eleven feet of such rail of the track.

The cedars and other obstructions, above mentioned, located alongside the railroad, north of the highway crossing, were at varying intervals from each other, so that when he came to the said point, ninety-five feet west of the track, the deceased, by looking through such intervals and the intervals between the maples, other smaller trees and telegraph poles aforesaid, had, for all practical purposes, a view of the track for a distance of some 786 feet north of the highway crossing, but the train at that time had not come within such scope of vision, it was then farther north, just out of sight of the deceased.

At the ninety-five foot point just mentioned, the deceased was moving at a very low rate of speed (about

eight miles an hour), and from that time until he reached the above mentioned point at which he first thereafter had a view of the track to the south, he moved very slowly, looking constantly toward the north. As he approached the track, he came nearer and nearer in line with said cedars and other obstructions on the western side of the railroad track, and it is a physical fact that his view of the track northward became more and more obstructed, until it was thus for a time completely obstructed, when he was about twenty-five feet from the track.

When the deceased reached a point about twenty-five feet from the said western rail of the track, he came almost to a stop, and as he thus paused he was still looking to the north. The touring car was either then in low gear, or the deceased then put it in low gear, and moved on very slowly at a speed of not over eight miles an hour, as estimated by the witnesses, and, as he did so, turned his face toward the south to see if any train was approaching from that direction. At this time the deceased had for the first time, as aforesaid, since coming within ninety-five feet of the track, a view of the track to the south. The deceased, as he sat in the touring car, was then about nineteen feet from the western rail of the track—the front of the touring car being, as aforesaid, about eleven feet from such rail, and within about nine feet of the danger zone or overhang of the train.

The train did not give any of the signals for the crossing required by the statute on that subject, and gave no other signal, or warning, until just as the deceased was at the point last mentioned and was looking to the south, as aforesaid, there was a loud blast of the whistle of the engine of the train given (the train being then from 170 to 324 feet from the crossing according to differ-

ent estimates of different witnesses for the plaintiff), at which moment the deceased turned, with frightened glance, to the north, and saw the train, then practically upon him, and was seen to make some kind of movement, as if to turn the touring car to one side; but the front of the touring car by that time must have been within the overhang of the train, and as testified by witnesses for plaintiff, it was then "too late" for anything to be done by anyone, which could have averted the accident—the deceased could have then done nothing that could have saved himself—and he was struck by the train and killed.

Just at what distance the deceased was from the track when the train came within the scope of his vision, where he might possibly have seen it, while he was traveling from the point ninety-five feet west of the track until he reached the point at which he paused, as aforesaid (about twenty-five feet from the track), and how nearly he was in line with said cedars and other obstructions when the train first came within such scope of vision, and how completely, from that time on, the line of cedars and other obstructions obscured such scope of vision of the track to the north, until the deceased passed that line and came into full view of the track to the north, it is impossible to say with any degree of accuracy. Calculations based on the respective speeds of the train and of the touring car are inherently deceptive and misleading, for the reason that they have nothing but mere estimates of such speeds and of the respective distances the train and touring car were away from the point of collision, from time to time, to go upon; which, as we know, as a matter of common knowledge, are not accurate, and may vary from the true speeds, or distances, respectively, up or down, within wide limits. The inference, however,

from the testimony for the plaintiff, is reasonable, and, indeed, irresistible, that the train did not come within the aforesaid scope of vision of the deceased until that scope of vision was so obstructed by the cedars, etc., that he did not in fact see and could not, by the exercise of reasonable care, have seen, the train approaching until he came in full view of the track, as aforesaid, when he was looking to the south, as aforesaid, as it was his duty to do as well as to look to the north.

And that this is true is borne out by the testimony of the engineman of the train, a witness for the defendant, who testified that he was keeping lookout ahead at the time (who could see along the highway on which the deceased was traveling, through the intervals between the cedars, etc., and see an automobile thereon, as well as the deceased could look through such intervals between the trees, etc., and see the train approaching—the testimony of the engineman on this subject having been as follows:

"A.    *    *    I didn't see the automobile until we hit it.    *    *

"Q.    You never saw the car at all until you hit it?

"A.    No, sir.

"Q.    You were looking down the track, looking ahead?

"A.    Yes, sir.

"Q.    Could you explain to the jury how it was the car" (the touring car) "came along up and got on the track and you never saw it until it·was hit, if you were looking right down there?

"A.    I can't see around a corner; you see the right of way and the road goes diagonally across.    *    *    There is an obstruction here" (the cedar trees, etc., above mentioned) "that kept us from seeing the automobile until he got nearly in the right of way."

The circumstances with respect to the hearing of the approach of the train were as follows: There were several eyewitnesses of the accident, who had as good opportunities for hearing the approach of the train as the deceased would have had if he had entirely stopped the automobile, and they all testify that none of them heard the train until the loud blast of the whistle aforesaid was sounded, which was immediately heard and heeded by the deceased, as aforesaid, as soon as any one heard it. Whether the direction of the wind, or that the train was drifting down grade, lessened or silenced the noise of its approach, does not appear in evidence; but the fact remains that the train was heard by the deceased as soon as any one else heard it.

*Stewart K. Powell* and *Thos. H. Willcox*, for the plaintiff in error.

*Warner Ames*, *Mapp & Mapp* and *Herbert Barnes*, for the defendant in error.

SIMS, P., after making the foregoing statement, delivered the following opinion of the court:

The case is near the border line between the two classes of cases which are mentioned in *Davis* v. *Bowman*, 138 Va. 108, 121 S. E. 506, and is ruled by the latter case and those of the same class therein mentioned.

[2] As said in the *Bowman Case*, we say in this: "We have had occasion recently to pass upon many similar cases. The pertinent principles are well settled. After a most careful consideration of the evidence, we are of opinion that we cannot say as a matter of law that the plaintiff was guilty of contributory negligence;  *  * the instant case is controlled by the line of cases typified by *Seaboard Air Line Ry.* v. *Abernathy*, 121 Va.

173, 92 S. E. 913, and *Payne, Director General,* v. *Brown,* 133 Va. 222, 112 S. E. 833, and does not fall within the influence of *Washington & Old Dominion Ry. Co.* v. *Zell,* 118 Va. 755, 88 S. E. 309, and other cases of that class."

We will add that we find the evidence in the instant case, relied on by the defendant to support the contention that it is a case of negligence *per se* on the part of the plaintiff's intestate, to be much weaker than in the *Bowman Case.*

The case will be affirmed.

*Affirmed.*