# Wytheville

## VIRGINIAN RAILWAY COMPANY V. ELLA DANIEL RODGERS, ADMINISTRATRIX, ETC.

June 8, 1938.

Present, Holt, Hudgins, Gregory, Browning
and Eggleston, JJ.

The opinion states the case.

*Watkins & Brock, Hall, Buford & Carter* and *Williams, Loyall & Taylor*, for the plaintiff in error.

*W. Moncure Gravatt, J. Segar Gravatt* and *R. Page Morton*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

On July 15, 1936, at about 7:30 a. m., William S. Rodgers, while driving a truck northwardly across the Virginian Railway Company's single-track main line, at a grade crossing in Prince Edward county, was struck and killed by a westbound train. His administratrix has recovered a judgment against the Railway Company, which is before us for review.

Several acts of negligence were charged against the Railway Company. The first is that the road along which

Rodgers was traveling is a public highway, and that therefore the Railway Company should have given the crossing signal required by Code, sections 3958, 3959. It is admitted that no such signal was given.

After hearing the evidence adduced by the respective parties as to whether the road was a public highway or a private farm road, the trial court ruled that it was the latter, and that the giving of a signal was not mandatory under the above sections.

While no cross-error is assigned to this ruling of the trial court, a considerable portion of the brief of the defendant in error is devoted to the correctness of this ruling.

We have no difficulty in reaching the conclusion that the trial court was right in holding that this was not a public road and not a public crossing.

Before the construction of the Virginian Railroad, about thirty years ago, a public road, known as the County Line Road, ran along the dividing line between Prince Edward and Charlotte counties, in the general direction of the right of way of the Railway Company, as subsequently located. When the railroad was constructed it intersected, within a short distance, this public road at two points, the one east of the place where the crossing in controversy was later located, and the other to the west thereof. This left a segment of the public road located to the south of the railroad. In order to eliminate these two crossings the Railway Company sought and obtained from the boards of supervisors of the two counties permission to change the location of this segment of the public road, and to relocate it along the northern side of the Railway Company's right of way.

At the time of the accident Rodgers was cultivating a tract of land which was south of the railroad, and which touched on the abandoned segment of the County Line Road. In order to give this land and two other tracts south of the railroad access to the new highway as relocated, the Railway Company constructed the crossing in question and a road leading to said highway beyond.

In 1916 the Norfolk & Western Railway Company constructed a belt line a short distance to the north of and parallel to the Virginian Railway Company's track near this crossing. After this the public road was again moved and this time located to the north of the Norfolk & Western Railway Company's track.

Thus the road along which Rodgers was traveling at the time of the accident led northwardly from his farm and the two neighboring farms across the abandoned segment of the County Line Road, thence across the right of way of the Virginian Railway Company, and thence across the right of way of the Norfolk & Western Railway Company to the public road.

The evidence is undisputed that this road which Rodgers was using includes no portion of the old County Line Road. It had not been improved or maintained by either Prince Edward or Charlotte county, or by the State. Nor is there any evidence that it had been in any way accepted or recognized by any of the county or State authorities as a public road. It was not frequently used. Clearly, therefore, the crossing in question was a private and not a public crossing.

The principal contention of the administratrix is that the jury was justified, under the evidence, in finding that the physical conditions surrounding the approach to the crossing made it one of unusual and extreme danger; that the Railway Company had knowledge of these conditions; that it was negligent under the circumstances in failing to give a warning, either by bell or whistle, of the train's approach; and that such was the proximate cause of the accident. Furthermore, she contends, the evidence justified the jury in finding that the Railway Company had failed in its required duty to construct and maintain a reasonably safe or suitable crossing, and that such failure was the proximate cause of the accident.

The view we take of the matter makes it unnecessary to decide whether the Railway Company was guilty of any negligence which was the proximate cause of this accident,

for we think Rodgers was clearly guilty of contributory negligence which bars a recovery in this case.

On the morning of the accident Rodgers was proceeding northwardly along the above described farm road. He was driving a 1930 Chevrolet truck, and Henderson, a young colored man, was sitting beside him on the front seat. The cab of the truck was open at the sides and had glasses in the back to permit a rear view.

As Rodgers and his companion approached the railroad track from the south, their view to the right was obscured by a body of woods which extended up to the southern boundary of the Railway Company's right of way. These woods prevented their seeing a train approaching from the east until the truck had cleared the edge of the woods. There the road turns sharply to the left and proceeds along the southern edge of the right of way, approximately parallel to the track and down a slight grade a distance of about one hundred and forty feet. Here it turns to the right and runs for a distance of about twenty-five or thirty feet up a slight grade and across the track.

A westbound train, such as was involved in this collision, approaches the crossing on a three-degree curve to the left. It emerges from a cut east of the crossing. The deepest point of the cut is four hundred feet east of the crossing, where the banks rise eight feet above the rails. From this point the depth of the cut gradually diminishes to the west and reaches grade level about fifty feet east of the crossing.

At the time of the accident weeds and bushes were growing along the top and southerly side of the cut, and along the right-hand side of the road as Rodgers approached the crossing. The plaintiff's witnesses estimated the height of these weeds and bushes as ranging from eight inches to three or four feet, with some possibly attaining a height of six feet.

Jesse Henderson, who was riding in the truck with Rodgers at the time of the accident, and who has filed a claim for damages against the Railway Company, was not

called as a witness for the plaintiff. He was first examined as an adverse witness by counsel for the Railway Company, and cross-examined by counsel for the plaintiff. His testimony has little, if any, probative value.

He first testified that he looked for an approaching train when the truck came out from behind the woods; that he looked again as the truck made the right turn, just twenty-five or thirty feet from the crossing; and that at neither time did he see the train.

On being reminded of his testimony at a former trial of the case, he reverted to the story there related that he looked and listened continuously from the time the truck emerged from the woods until it reached the crossing, and still did not see or hear the train until the moment before the impact.

Five different witnesses testified that shortly after the accident, Henderson, who, though injured, talked in a rational way and seemed to be in possession of his faculties, said that he knew the train was coming and so told Rodgers, but that the latter replied that he thought he could get across ahead of it. When confronted with the proof of this admission, Henderson's reply was that due to his injury he did not recall whether or not he had made this statement. However, he finally admitted that the train was visible when the truck got within ten or fifteen feet of the track.

Other witnesses for the plaintiff testified that, after the truck had made the turn to the right and was proceeding upgrade toward the track, due to the bushes to the right a driver of the truck could not see a train approaching on his right from the east until the truck was practically on the track.

When we consider the undisputed fact that the top of the engine was nearly sixteen feet above the rails, it is impossible to reconcile this testimony with the photographs of the crossing taken within a few hours of the accident.

Moreover, actual tests taken at the scene of the accident prove that from a point twenty-five feet south of the crossing the rails were visible two hundred and seventy-five feet east of the crossing, and that at the same point the top of

a twelve-foot rod was visible five hundred and twenty-five feet east of the crossing. Even allowing for the difference in the height of the bushes and weeds at the time of the accident, and at the time these measurements and observations were taken, it is difficult to understand how it can be said that this engine was not visible until the truck reached the crossing.

But aside from this, no witness testified that the train was not visible if Rodgers had looked to the rear while he went the distance of approximately one hundred and forty feet, parallel to the track. In fact, Jackson, one of the plaintiff's principal witnesses on the condition at the crossing, testified that Rodgers could have seen the train as he went along this stretch of the road if he had looked back. The photographs clearly demonstrate this to be true.

Rodgers was familiar with this crossing and its dangerous nature. Presumably he knew that no signal was given by trains approaching it. His wife testified that he had used it as many as six times a day during the preceding two and one-half years during which he had lived in that vicinity. If, in fact, the train was not visible when the truck was traversing the last twenty-five feet before reaching the track, he knew this and should have looked before he reached the point where his vision was obscured.

This court has many times said that a person approaching a railroad track must look where looking is effectual. *Washington & O. D. Ry. Co.* v. *Zell's Adm'r,* 118 Va. 755, 760, 88 S. E. 309; *United States Spruce Lumber Co.* v. *Shumate,* 118 Va. 471, 475, 87 S. E. 723; *Cashell* v. *Southern Ry. Co.,* 152 Va. 335, 342, 147 S. E. 209; *Norfolk & Western Ry. Co.* v. *Eley,* 157 Va. 568, 574, 162 S. E. 3. He can not wait until his view is obstructed and say that it would have been useless for him to have looked then.

There is no evidence that Rodgers looked at all as he approached the crossing. Henderson said he did not know whether Rodgers looked or not, but that he (Rodgers) did not ask him (Henderson) to look.

But this is not all. The testimony is undisputed that this train was proceeding at approximately thirty miles an hour, and was emitting considerable smoke as it approached the crossing. A colored woman and her thirteen-year-old son testified that they were in a field much further south of the track than the road on which Rodgers was traveling. The truck was in their view from the time it emerged from the woods until it reached the crossing. The smoke of the approaching train was then plainly visible as it came through the cut. The boy testified that the engine was giving out a "whole lot" of smoke which was going "straight up in the air," and that he started toward the crossing to see whether the truck or the train would arrive there first.

Jackson, who, we will recall, was one of the plaintiff's principal witnesses as to the visibility at the crossing, testified that after Rodgers had cleared the woods, despite the intervening weeds and bushes, the smoke of the approaching train was plainly visible to him if he had looked in that direction.

The only evidence as to the speed of the truck comes from James Brown, a witness for the plaintiff, who was on the right of way near the crossing. He testified that he saw the truck "running pretty fast" as it approached the crossing, and that it slowed up just as "it was pulling up on the crossing." This uncontradicted evidence shows a remarkable lack of caution on the part of one who should have known that he was approaching a situation of extreme danger. "The greater the danger the greater was the measure of his duty." *Washington & O. D. Ry. Co.* v. *Zell's Adm'r, supra,* 118 Va. at page 759, 88 S. E. at page 310. This duty Rodgers plainly disregarded.

Much emphasis is laid in the brief of the defendant in error on the testimony of Rodgers' son that there was a mud hole in the road about twenty-five feet from the track. The argument is that this probably distracted Rodgers' attention and released him from the obligation to look out for the approaching train. But there is not the slightest evidence that the condition of the road in any way interfered with

the driving of the car, or distracted the attention of Rodgers. Henderson, Rodgers' companion, made no such claim, and the testimony of the plaintiff's own witness that the truck was proceeding "pretty fast" and only slowed up when it reached the crossing, refutes this argument.

We think that the undisputed facts and circumstances of this case, proof of many of which come from the plaintiff's own witnesses, lead irresistibly to the conclusion either that Rodgers did not look for the train as he approached the crossing, or else looked and saw it and thought that he could cross ahead of it. In either event his contributory negligence is perfectly manifest. See *Norfolk & Western Ry. Co.* v. *Hardy,* 152 Va. 783, 796, 148 S. E. 839; *Washington & O. D. Ry. Co.* v. *Zell's Adm'r, supra.*

We are of opinion that the motion to set aside the verdict of the jury should have been sustained. The judgment complained of will accordingly be reversed and a final judgment entered in this court for the plaintiff in error.

*Reversed and final judgment.*