[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 728 
On August 27th, 1938, there were filed in the Civil District Court for the Parish of Orleans three damage suits all growing out of the same accident, — an automobile collision which occurred on the afternoon of August 29th, 1937, on the concrete highway between Covington and Slidell in Louisiana. One of the automobiles which was involved was a Hudson sedan owned and driven by F. Poche Waguespack and occupied with him by his wife, Mrs. America Abaunza Waguespack, and their three minor children, F. Poche Waguespack, Jr., and America Waguespack, both of whom were injured, and a third child, who was not hurt. The other automobile was a Chrysler owned by James Rummel, which was being driven at the time by Ernest Savarese. Rummel was seated alongside Savarese on the front seat.
In the first suit filed, Mr. and Mrs. Waguespack are plaintiffs for themselves and also on behalf of their two minor children who were injured. They make both Savarese and Rummel defendants and they ask for solidary judgments against them or, in the alternative, "against whichever of the defendants may be legally liable for the consequences resulting from the accident * * *".
Savarese and Rummel, in separate suits, pray for solidary judgments against Waguespack and the Indemnity Insurance Company of North America alleging that that corporation is the liability insurance carrier of Waguespack and that, therefore, judgment may be rendered directly against it because of Act 55 of 1930.
It was agreed that the three suits should be consolidated for all purposes and, after a trial, there was judgment dismissing the suits of Savarese and Rummel and in favor of Mr. and Mrs. Waguespack and their children, and against Savarese and Rummel solidarily in the following amounts:
In favor of Mr. Waguespack, himself, for $1558.00
In favor of Mrs. Waguespack for 500.00
In favor of Mr. Waguespack for the use and benefit of the minor, F. Poche Waguespack, Jr., for 100.00 and
In favor of Mr. Waguespack for the use and benefit of the minor, America Waguespack, for 300.00
Savarese and Rummel have appealed and Mr. and Mrs. Waguespack, both on their own behalf and for the benefit of their two minor children, have answered the appeal asking that the award in each case be increased to the amount originally prayed for.
The record shows that the accident occurred at about 5 o'clock on the afternoon of Sunday, August 29th, 1937, at a point a few miles west of Slidell. The weather was clear and the paved concrete highway was dry. The Rummel car, a Chrysler, was going west and the Waguespack car, a Hudson, was proceeding east. *Page 729 
Mr. and Mrs. Waguespack declare that as the cars approached each other, the Rummel car swerved to its right to such an extent that its right front wheel left the concrete portion of the highway and, on the dirt shoulder, struck a small puddle of water and that the driver, Savarese, pulled it so suddenly to the left that it not only passed back on to the concrete, but, in fact, swerved over to the left or wrong side of the highway, and that then Savarese again turned it sharply to the right and then, at least once more, "zig-zagged" back and forth from one side of the highway to the other.
Mr. Waguespack states that as the Rummel car was thus zigzagging back and forth, he was driving his car as far to the right as it was possible to drive it with safety; that he could go no further to the right because of a deep ditch which was on that side of the shoulder. He says that as he was doing this, he was also reducing the speed of his car which was already slow but that on the last swerve or zigzag, as the Rummel car was going back from the wrong side of the road towards its correct side, it passed diagonally in front of his car, and that its left front fender struck his car and turned it to its left, badly damaging it and injuring himself, Mrs. Waguespack and their two children.
Savarese and Rummel, on the other hand, declare that their car was at all times on the correct side of the road and that the Waguespack car was the one which left its correct position on the highway and passed partially to the shoulder to the right, and that, in attempting to drive it back upon the concrete, Waguespack pulled it too sharply to the left and crashed it into the left side of the Rummel car as it was passing.
The Waguespack version is corroborated by two other motorists whereas the other version finds support in the statement of a third disinterested automobile driver who says that he, too, witnessed the collision.
F.B. Otell, one of the motorists who corroborates Waguespack's version, says he was driving behind the Rummel car and that he saw it run off the edge of the concrete and splash into a puddle of water. He adds that
"This car (the Rummel car) went off the edge of the road on the right side of the road. There was evidently a rut filled with water on the edge of the road as I saw a splash. The car cut suddenly to the left in an attempt to get back on the road and crossed to the left or wrong side of the road. This car went as far to the left as a car should be travelling in the opposite direction. As the car cut again to the right it was struck by the car of Mr. F. Poche Waguespack travelling on his own right side of the road in the opposite direction. The collision occurred on Waguespack's side of the road."
He also says:
"The point of collision occurred somewhere on the South, or Waguespack side of the road. The Waguespack automobile was on the South or its right side of the road headed straight East and the Rummel car which was on the South side of the road attempting to get back to the North side was struck by the Waguespack automobile. At the time of the actual collision the Rummel car was attempting to get back to its own side of the road and was partially over the center."
The other witness who agreed with the Waguespack version was E.J. Morel, who says that he was driving behind Mr. Waguespack and that the Rummel car evidently "* * * pulled over to its own right side, and evidently got on the soft shoulder, and pulled back to the left side, and went that way for, oh, I guess two or three times, and finally it struck Mr. Waguespack's car on its own right side going into Slidell. In other words, Waguespack's car evidently struck the Chrysler on its left side."
On the other hand, the third disinterested eye-witness, Mr. Robert, says that he was following the Rummel car; that it did not run off the concrete to its right and did not, at any time, cross to the wrong side of the road or zigzag back and forth. He says, on the contrary,
"It looks like the big car (Waguespack's) either hit a rock or a shoulder."
He states that, in trying to drive it back upon the concrete, Waguespack "cut like that * * * towards his left" and "after it was cut like that and bounced around * * * well, they came together."
It seems to be well established that when the automobiles came to a stop the Rummel car was almost entirely off the concrete on its correct side of the road, and that the Waguespack car was at least part way across the center line of the concrete with the front portion on the wrong side and it is hard to understand how these cars could *Page 730 
have come to rest in those positions if the accident occurred as Mr. Waguespack says it did. However, when we study the oral evidence we find that that in favor of Mr. Waguespack preponderates to such an extent as to leave in our minds no doubt that the accident occurred just as he and his witnesses say that it did. And our brother of the District Court must have thought so too.
Counsel for Savarese and Rummel attack the testimony of Waguespack and his witnesses, claiming that it contains contradictions and inconsistencies. In minor particulars, there is no doubt that it does, but not to such an extent as to create the impression that it is untrustworthy.
The record is a very large one. We have carefully compared all of the testimony and can reach no other conclusion than that the Rummel car did leave its correct position and did swerve back and forth at least twice from its correct side of the road to the other, and that finally, as it was being driven back to its correct side, the Waguespack car struck it at or near its left front fender, causing damage along the left side and knocking off the left door.
The question which has caused us much concern is whether or not, in spite of these actions of the Rummel car, Waguespack could not have avoided striking it had he had his car under control and had he been on the alert. It is by all conceded that neither of the cars was being operated at an excessive speed.
If Mr. Waguespack's story is correct, when he was somewhere between 150 and 300 feet from the other car he saw it swerve to his side and back at least twice. It is obvious that this must have taken a few seconds. And, since he was driving at a moderate speed, it is possible that he might have brought his car to a stop when he saw the other car cut to his side of the road. And yet we think it quite possible that, as he says, he did not realize that the other car would stay on the wrong side or would come back to the wrong side and he assumed, as he was justified in doing, that it would return to its correct position and would remain there. He assumed what Mr. Blashfield in his work entitled Cyclopedia of Automobile Law and Practice says he had a right to assume:
"A motorist has a right to assume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such assumption in determining his own manner of using the road. A driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left hand side, will do all that a reasonably prudent person, under all the circumstances, would do to avoid a collision, which ordinarily would be to yield half the way or to turn out in time to avoid a collision, and that such driver will not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road on which he is lawfully driving.
"Likewise, a motorist on the right side of the road and traveling in a lawful manner can assume that one approaching in the opposite direction will control his car in obedience to the law of the road and will not suddenly turn across his path." Vol. 2, Perm.Ed., § 919, page 60.
As a matter of fact, however, the Rummel car came back to the wrong side, and, on its last trip, was obviously so close to Waguespack when he realized that it had done so, that he could not bring his car to a stop and could pull it no further to its right.
It is true that modern automobiles are capable of being stopped in remarkably short distances but since these cars were approaching each other at a speed of about 30 or 35 miles an hour the distance between them was being eliminated at the rate of about 60 miles per hour and had they continued at the same speed, this distance would have been eliminated, if they were 200 feet apart, in about two seconds. Even then, if both drivers reduced speed as they say they did, it was no doubt only 4 or 5 seconds between the original swerve and the final crash. It cannot be said that Mr. Waguespack was negligent in not bringing his car to a stop when only such a short time intervened between the first swerve of the Rummel car and the collision.
Having concluded that the accident was caused by the fault of Savarese, it becomes necessary to consider whether his negligence rendered Rummel liable as well as himself. Rummel was the owner of the car and, of course, it is too well settled to permit of discussion that the mere fact of ownership would not of itself make him liable. Rummel was somewhat older than Savarese, and it appears that Savarese enjoyed driving and that on the many fishing trips, drives to baseball games *Page 731 
and other excursions which they were in the habit of making together, Rummel almost always permitted Savarese to drive his car. The record justifies the conclusion that on the day of the accident both Rummel and Savarese contemplated that they would ride somewhere together, though until Savarese called Rummel and suggested it nothing had been said about their taking a trip.
When Savarese called Rummel and suggested the trip, Rummel readily acquiesced and then Savarese suggested that if Rummel had no particular preference concerning the place to which they would go, he would like to ride to Abita Springs "to visit a friend or something." From this we think it clear that the particular purpose or object of the two in making the trip was the ride and that though the destination was selected by Savarese, it would not be proper to say that the controlling reason for which the trip was made was a visit which Savarese desired to make. The trip would have been made any way, though possibly to some other place. And Abita Springs was selected as a destination merely because Savarese knew that Rummel would like to make a trip some where, and he (Savarese) thought that he would like to "kill two birds with one stone." What then was the legal status of Rummel and Savarese inter se?
That counsel for plaintiff themselves are not certain that Rummel can be held for the negligence of Savarese is evident, for, in the petition, though solidary judgment is prayed for against both Savarese and Rummel, there is an alternative prayer which reads as follows: "* * * or, in the alternative, against whichever one of the defendants may be legally liable for the consequences resulting from the accident above described."
If the trip may be viewed as a joint adventure or enterprise in which they were both interested and in which, though the car was actually being operated by one, the other had an equal right to control, then each could be held liable for the negligent operation, for the doctrine of joint adventure or joint enterprise is recognized so far as we have been able to ascertain in all jurisdictions.
The rule is stated by Mr. Blashfield in his permanent edition of Cyclopedia of Automobile Law and Practice, Vol. 4, § 2494, as follows: "Generally speaking, if two or more persons engage jointly in a common enterprise, or joint venture, in connection with, or furtherance of, which they use and occupy a motor vehicle driven by one of their number, but in the management and control of which both or all, as the case may be, have equal authority and rights, each assumes responsibility for the conduct of the one who is doing the driving; * * *".
It is not necessary that both be actually engaged in the operation of the vehicle; in fact, it is generally recognized that such a requirement would be extremely dangerous and that all that is necessary is that the one who is not driving have the right, to some extent, to direct or control, and that this right be not limited merely to the selection of the route.
In Corpus Juris, Vol. 42, page 1179, § 957, the rule is stated as follows:
"Where an occupant of a motor vehicle is engaged in a common or joint enterprise with the driver and has an equal right to direct and control the operation of the vehicle, the contributory negligence of the driver is imputable to the occupant. This is so although one takes no actual control while the other is driving. To constitute occupants of a motor vehicle joint adventurers, there must be not only joint interest in the objects and purposes of the enterprise, but also an equal right to direct and control the conduct of each other in the operation of the vehicle. * * *".
There are in Louisiana decisions involving facts somewhat resembling those found here and in which the joint adventure defense was rejected but it is obvious from a reading of those decisions that the defense was rejected not because as a legal concept it will not be accepted here but because the facts of each of those cases did not justify its application. The two cases which we have in mind are Lawrason v. Richard, 172 La. 696,135 So. 29, and Lorance v. Smith, 173 La. 883, 138 So. 871.
In the Lawrason case six members of a college fraternity met at one point for the purpose of going together to an initiation and dance. They arrived at the meeting point in various cars and then decided not to use all of the cars to go to the dance but to crowd into one or two of them.
The automobile which was involved in the accident was driven by its owner and with him in it were several other members of the fraternity. It was contended *Page 732 
that under those circumstances the negligence of the driver and owner should be imputed to the others for the reason that they were engaged in a joint enterprise.
On first hearing the Supreme Court held that they were engaged in a joint enterprise. Rehearing was granted and the Court then said [172 La. 696, 135 So. 31]:
"There is no joint adventure, in the sense that the occupant of an automobile is equally liable with the driver unless there be also equal right to control the operation of the automobile. * * *"
This was not a rejection of the doctrine but a holding that it had no application to the facts of that particular case.
In the Lorance case the car was owned by W.R. Smith, the defendant, who had permitted his minor son to use it. It was being driven by another minor and in it were two other persons. The court, recognizing the soundness of the joint adventure doctrine as a defense where it is applicable, held that under the peculiar facts shown it was not applicable in that case, saying [173 La. 883, 138 So. 875]: "* * * that it was agreed that one member of the party, Clark Morgan, should drive the car, and it is not shown that the others had any authority, express or implied, to control its operation."
There is no doubt in our minds that though Savarese was driving the car, Rummel, who was the owner and who knew how to operate it, had the absolute right not only to agree on the route but to take over the wheel himself or to direct Savarese as to speed or in any other particular in which it might have appeared to him that Savarese was driving improperly. Under the facts shown here, Rummel and Savarese were engaged in a joint adventure or enterprise. It is quite true that had Rummel been driving his own car, it might not have been correct to hold Savarese liable for his negligence because under those circumstances, even though they were engaged in a joint pleasure ride, Savarese might have been considered as the mere guest of Rummel and, as such, not liable for Rummel's neglect in the operation of his own car. But where the owner permits his car to be driven by a friend and with him engages in a joint pleasure ride, the owner obviously retains the right of control to such an extent as to render him liable for the negligence of the other driver. There may well be cases in which an owner lends his car to a friend and then rides with the friend. Where the owner is not interested in the object of the trip, it is proper to hold that the owner is not engaged in a joint adventure and is not liable. Such a case was Kronenberg v. Whale, 21 Ohio App. 322, 153 N.E. 302.
We think that the case at bar more closely resembles Washington O.D. Railway v. Zell's Adm'r, 118 Va. 755, 88 S.E. 309. Mr. Berry in the Sixth Edition of his work on Automobiles, Vol. 1, page 514, comments on this case as follows:
"Where two persons, intimate friends, one of whom owned an automobile, went on a pleasure trip, in which they were equally interested, the one who did not own the car getting it ready for the trip, they were engaged in a joint enterprise, and the negligence of the one who was driving, without regard to which it was, in going upon a railroad crossing, where the machine was struck by a train, was imputable to the other."
Even if it could not be said that Rummel and Savarese were engaged in a joint adventure, we think that under the circumstances shown it would be proper to say that Savarese, in driving the car, was the agent of Rummel and that, therefore, for that reason, Rummel would be liable for his negligence; for surely where an owner of an automobile is interested in taking a pleasure trip and invites a friend to go with him, and permits the friend to drive, since the owner is interested in the object of the trip, i.e., his own pleasure, he should be held liable for the negligence of the friend whom he invites or permits to operate his car. Savarese and Rummel are solidarily liable for the results of the negligence of Savarese.
We come now to consideration of the extent of the injuries sustained by Mr. Waguespack, his wife and their two children. Dr. Landry, who treated them, says that Mr. Waguespack "had a fracture of the sixth rib on the left * * * a laceration of the scalp * * * in the occipital region * * * a fracture of the malar bone * * * the bone of the face * * * the cheek bone."
He also said that the injury to the head required about five or six sutures because of the laceration which was about 2 1/2 inches long; that it was necessary that Mr. Waguespack's chest be strapped to protect the broken rib and that it remained *Page 733 
strapped four or five weeks. From the testimony of both Mr. Waguespack and Dr. Landry, it seems that he was incapacitated for from six to eight weeks, and that though he was not confined to his bed for all of that time, he could not attend to his work.
The automobile is shown to have been almost completely demolished. It was a Hudson sedan, about 2 1/2 years old and, after the accident, was traded in by Mr. Waguespack for $75. The repairs which would have been necessary had been estimated as costing $343.
Mr. Waguespack was allowed $1,558 for himself. He has asked for an increase in the amount but we think that the award is correct.
Mrs. Waguespack was allowed $500. According to Dr. Landry "she had a deep lacerated wound of the scalp and also a deep lacerated wound over the knee."
The laceration of the head was in front and just at the hair line. It required about 8 or 10 sutures. The doctor said that he would classify the head laceration as being a deep one about 2 1/2 or 3 inches long. He said that Mrs. Waguespack was incapacitated for "fully two to four weeks"; that such injuries would cause considerable pain and that the injury to the knee required Mrs. Waguespack to remain quiet for sometime. She has requested an increase in the award. While her injuries were undoubtedly painful and caused considerable suffering, we do not think that $500 is inadequate.
The little girl, America Abaunza, sustained a fracture of the nose and bruises about the nose and eyes. Dr. Landry recommended that she remain quiet for three or four weeks and said that he could not say whether the fracture of the nasal bone would cause deformity. Mr. Waguespack testified that a specialist had said that it would be necessary to rebreak the bone and reset it when the young girl should reach 16 or 17 years old. The amount awarded, $300, should possibly be increased if there were certainty that this painful treatment would have to be sustained later on. But, in view of the indefinite testimony on this point, we think the award should not be disturbed.
The young boy, F.P. Waguespack, Jr., sustained very little injury. The award was $100. Dr. Landry says that "he had contusions, especially about the knee. He had considerable swelling about his knee."
He adds that this injury was "not entirely superficial because the amount of injury to the knee caused considerable swelling to the deeper structure, muscles, etc."
The award of $100 is not excessive, and it is not asked that it be increased.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.