# Richmond

ROBERT GAINES v. J. M. CAMPBELL, ADMINISTRATOR, ETC.

November 17, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

508

The opinion states the case.

*Charles Curry* and *Curry Carter,* for the plaintiff in error.

*John T. Harris,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Plaintiff's decedent, Mabel Campbell, was killed in a highway collision between a motorcycle and an automobile. Her administrator recovered a judgment confirmed by the court. The defendant has appealed.

The deceased had lived in Bedford county, Virginia, and a short time before her death was enrolled as a student in the Harrisonburg State Teachers College. Her sister, Thelma, her brother, Troy, and two cousins, Opal and Carl Grant, on the day of her death, came on motorcycles to visit her in Harrisonburg. Thelma and her brother rode on one and the Grant boys on another. Soon after their arrival in that town they and Mabel Campbell decided to visit some friends in Bridgewater, and went upon their way, Thelma and her brother, Troy, on one machine, followed by the Grants with their cousin Mabel on another. The Grant motorcycle was driven by Opal. Carl sat behind him. In front was Mabel, sidewise on the gas tank, facing the right. This tank is a flat-topped container, ten inches across, placed between the driver's seat and the steering rod. They moved west on Grace street, and at its intersection with High street turned to their left and to the south. An attached plat helps us to place the evidence. High street is an arterial highway; Grace is a tributary street. At their east intersection on Grace is a sign, "Stop." These streets do not cross at right angles, and their southeast intersection is on a curve and not at an angle.

Plaintiff claims that the Opal Grant motorcycle moved along the north side of Grace street until it was near and to the right of the stop sign, where, in obedience to that signal, it halted; afterwards it moved across, or partly across, High street at a proper speed and to the right, going

south, when it came into collision with defendant's automobile, driven on the wrong side of the road, recklessly and rapidly.

The defendant, denying negligence, has charged contributory negligence, and in his statement claimed that the

SKETCH
SHOWING INTERSECTION
HIGH STREET WITH GRACE
HARRISONBURG VIRGINIA
OCT. 6ᵀᴴ 1930        SCALE

trip itself was a joint venture, that the motorcycle was moving at illegal speed on the wrong side of the road, and that it was negligence *per se* for three people to undertake to ride on it. If we accept his testimony, he was to the right of the center of High street, going north at the rate of about twenty-five miles an hour, when he first saw the

motorcycle, which passed without let-up to the left of the stop sign on Grace street, and came rapidly south on the east side of High street; that a head-on collision seemed imminent, and in the sudden emergency thus created he, to save himself and them, cut short to the left.

He said: "When I first saw the motorcycle I took my foot off of the accelerator and slowed up and saw at the last moment that there was no way to avoid it unless I cut short to the left."

Three people should not undertake to ride on an ordinary motorcycle, and if the crowding thus occasioned contributes to an accident, they have themselves to blame; but recovery cannot be defeated merely 'because Mabel Campbell was negligent. Negligence is no defense unless contributory.

The limitations which this rule imposes are well stated by Mr. Justice Epes in *Virginian Railway Co.* v. *Haley,* 156 Va. 350, 157 S. E. 776, 784, where he said: "The rule applicable to all actions for the recovery of damages for an act of negligence is that there can be no recovery unless the negligence of the defendant, or that for which the defendant in law must answer, to some degree, or in some way, contributed proximately, and not remotely, to causing the damage for which recovery is sought."

Mabel Campbell was a small woman, somewhere between five feet two inches and five feet two and one-half inches high. Opal Grant, the driver, was a tall man—height six feet two inches. His evidence is that he could see over her head, and that her position in no wise interfered with his management of the motorcycle. In this he is supported by his brother, Carl. Both of them are experienced drivers.

On the other hand, the evidence for the defendant, particularly that of Lester Jones, a motorcycle traffic officer, is to the effect that a woman, seated as Miss Campbell was, would interfere with the driver's vision, with the shifting of gears and with the application of brakes.

In an instruction offered on behalf of the defendant this matter was submitted to the jury. It held with the plaintiff. That verdict we cannot disturb unless the evidence to support it is intrinsically incredible. When competent and unimpeached witnesses clash, the issue is usually for the jury and courts can interfere only in extraordinary circumstances. Here we must abide by its finding.

■ Was Miss Campbell a party to some joint adventure? If so the negligence of her associates can be imputed to her, but not otherwise. The major test, when we undertake to impute to a plaintiff the negligence of her driver, is this: Was he her agent, and did she have any control over the management of the car? Not until these facts are established can the doctrine of "joint enterprise" be invoked.

■■ "The 'joint enterprise' which will render the contributory negligence of a driver imputable to a person riding with him must invest such person with some voice in the control and direction of the vehicle. The rule is founded upon the doctrine of principal and agent. The passenger must be so related to the driver as that the maxim 'qui facit per alium facit per se' is applicable. As said by this court in *Virginia R. & P. Co.* v. *Gorsuch,* 120 Va. 655, 91 S. E. 632, Ann. Cas. 1918B, 838: 'The doctrine of imputable negligence has been discussed and the books are full of cases dealing with the question. There are some conflicts in the decisions, but it may be regarded as settled by the overwhelming weight of authority that the negligence of the driver of an automobile will not be imputed to a mere passenger, unless the passenger has or exercises control over the driver.' " *Director General* v. *Pence's Adm'x,* 135 Va. 329, 116 S. E. 351, 356; *Morgan's Adm'r* v. *A. C. L. R. Co.,* 136 Va. 394, 118 S. E. 233; *Virginian Ry. Co.* v. *Farr,* 147 Va. 217, 136 S. E. 668; *Boyd* v. *Mahone,* 142 Va. 690, 128 S. E. 259; *Norfolk & P. Belt Line R. Co.* v. *Parker,* 152 Va. 484, 147 S. E. 461.

■ The case in judgment is an ordinary one in which a man takes a woman to call on some mutual friend. Opal

Grant was in no sense Miss Campbell's agent, and so the doctrine of "joint enterprise" cannot be applied, and it is not made a joint venture because witnesses so define it.

Has defendant's negligence been shown and did it contribute to the accident?

An ordinance of the town of Harrisonburg makes it unlawful, in a residential district, to drive over twenty-five miles an hour; it makes it unlawful to drive to the left of the center of any street, and unlawful to make a left turn without passing to the left of the center of an intersection, whether marked or not, subject to certain exceptions irrelevant here.

Between one and two o'clock on the afternoon of October 5, 1930, Gaines, who lived in Dayton, started to Harrisonburg, on baseball bent. "The world series was going on and I went to look at the scoreboard." Naturally he wanted to be on time. At the moment of the accident, Carl Grant thought that Gaines was traveling at about forty miles an hour. As we have seen, Miss Thelma Campbell was on the motorcycle which preceded Grant's, and was about fifty yards ahead of it. Gaines passed her, and passed, of course, only a moment before the collision, traveling "not under thirty-five to forty miles an hour." His car, with him in it, weighed something like 2,550 pounds. The motorcycle, with its three passengers, probably weighed about 1,000 pounds. The impact, which was a little behind the right front axle of the automobile, bent that axle and of course threw the wheel out of line. Thus disabled and with brakes applied sufficiently to make skid marks upon the pavement, this car continued on for fifty-eight feet across Grace street to its north side where it mounted the curb and ran for twelve and one-half feet along the sidewalk. Although on an arterial highway, Gaines knew that he was approaching an intersecting street on which traffic might be passing.

From this evidence the jury was warranted in finding that the defendant was traveling at an excessive rate of speed, and in violation of the town ordinance. That

he was on the wrong side of High street is conceded. Mabel Campbell was thrown forward and fell near what appears on the attached plat as blood spot No. 3. Opal fell at blood spot No. 2 and Carl at blood spot No. 1. These men were not thrown over the automobile, and must have fallen to its right—that is to say their bodies lay nearer the center of High street than was the automobile which struck them. Carl lay seventeen feet and six inches from the west edge of that highway and twenty-seven feet four inches from its east boundary. Opal was nineteen feet four inches from the west edge and twenty-seven feet from its east line. These distances and the skid marks show that the car itself was well to the left.

Of course, neither the violation of an ordinance nor any other act of negligence will of itself support a recovery. Between the act and the accident there must be causal connection. *Gilley* v. *Simmons,* 145 Va. 549, 134 S. E. 550.

Gaines, as we have seen, claims that the car was so placed by him in an effort to avoid a head-on collision; that the motorcycle was coming rapidly down High street on its left and where it should not have been and was not expected, and that in an emergency thus created and for which he was not responsible, he reacted as might have been expected of any reasonable man, and as the lesser of two evils he turned sharply to the left to avoid a head-on collision.

Stated from his standpoint his explanation of his conduct is not entirely clear. He saw them coming head-on and thought there would be a collision. He was on the right side of the street. In this situation he thought they were going to turn to the right, his statement being: "I guess they decided to go on their right." In the light of this belief there was no occasion for him to turn sharply to his left, nor is it clear how the motorcycle, if it was rapidly approaching him on the east side of High street, could have reached the point of collision as is shown by an inspection

of the plat. That point is about ten feet south of Grace street as it crossed High.

When we come to consider facts which are the subject of sharp dispute, and have ascertained that a jury's verdict and a court's judgment find in the evidence substantial support, our task is at an end. It would be futile to discuss conflicts in detail when at the end we would have to admit that the verdict and judgment are controlling. It is only necessary to know that there is evidence sufficient to support the verdict.

If Gaines' car did not turn suddenly to the left and across the center of the road, then by way of defense he has no case on its merits; and if he were already across the center of the road, he is not helped by the fact that he then undertook to turn suddenly to the left.

A. R. Myers, who made the plat in evidence, went for that purpose to the scene of the tragedy on the following morning. He tells us that there were two skid marks. The east one was eight feet long and seventeen and two-tenths feet from the west street curb. The west track was five and one-half feet long and sixteen and two-tenths feet from said curb, and "one showed at one time and one at another. Both tracks were not in the same place." They started fifteen or twenty feet back of where the motorcycle finally came to rest. He further said that these marks ran in a northwesterly direction, but were nowhere east of the center of the street. Mr. Logan, police sergeant of Harrisonburg, said that they ran straight with the road. Mr. Fawley, sheriff, said that they were well to the west of the center of the road. Mr. Hinton was of opinion that the car was in the center of the road when it started to skid. Mr. Moore thought that the skid marks ran from the center to the left-hand side of the road.

Miss Thelma Campbell, who rode with her brother, Troy, passed Gaines fifty yards south of the point of collision. He was then on her side of the road. Carl Grant said that just as they had gotten across High street he saw Gaines

coming. "The car shot over the hill and when the car got about thirty yards of us he looked like he cut short and I thought there was going to be an acident." "Q. You saw him coming on the west side of the road? A. Yes, sir."

So much for the testimony. Photographs show, as we have seen, that the motorcycle struck the automobile just in the rear of the right end of the front axle. The blow was not at right angles but glancing, as is shown by the fact that the rear fender of the automobile was struck and bent, from which it would seem that the angle of approach was about what might have been expected had the motorcycle moved from near the stop sign in Grace street directly to the point of collision, if we remember that the car itself had then cut to its left. The motorcycle itself was badly damaged, and fell to the left on Opal Grant. It was afterwards moved to the point marked "oil spot" on the map.

If Gaines was met fifty yards south of this point, then to the left of the road, and if he was to the left of the road when Carl Grant saw him, and if the skid marks were where witnesses for the plaintiff have placed them, then he must be mistaken in believing that he was forced there by some sudden emergency. On this question the jury was adequately instructed and has found against him.

Opal Grant does not seem to have any particularly clear recollection of what occurred. He remembers their starting out, the order in which they went, where Mabel Campbell sat, that she was a small girl and did not interfere with the operation of his car, and that he stopped at the "stop" sign upon entering High street, looked and saw no one coming. He was knocked unconscious and remained so for twelve days.

If he be charged with all the information that a proper lookout could have given, this would be the situation: He would have seen Gaines come into view on the wrong side of the road more than fifty yards away. He could and should have assumed that Gaines would obey the rules of the road and bear to the right, and so he was not negligent

in bearing to his right. Let us assume that he was negligent. That cannot be imputed to decedent. It would have been confusing in the extreme for her to have undertaken in such circumstances to tell an experienced driver what to do.

Next it is said that the plaintiff deliberately introduced testimony showing or tending to show the defendant to be insured, and that a judgment, if reached, would not fall upon him but the insurance corporation. If this charge be sustained by the record, then error has been committed. No fair reason for such an appeal has ever been suggested. Patently, its purpose is to spoil the Egyptians. *Lanham* v. *Bond*, 157 Va. 167, 160 S. E. 89; *Rinehart & Dennis Co.* v. *Brown*, 137 Va. 670, 120 S. E. 269.

A fair reading of the evidence fails to sustain this assignment of error. Mr. Staley, one of the defendant's witnesses, took certain photographs, which he afterwards introduced in evidence. With him were Mr. Branham and two other gentlemen. Mr. Branham directed the placing of an automobile that the situation might be reproduced. The car itself belonged to the men who went with him. Staley was asked who they were, and said that he did not know. He was further asked: "Q. At the direction of Mr. Branham you and this mysterious gentleman placed the car? A. Yes, sir." Inquiry as to the identity of these men came almost as an automatic suggestion. When photographs are introduced, court and counsel naturally wish to know who took them, or who aided in their taking.

Staley was next asked if he turned these photographs over to those men. He answered: "To Dovel and Dovel." It is fair to assume that these men were not Dovel and Dovel, for it is said that Dovel and Dovel were well known in Harrisonburg, while Staley did not know the men then present, and so the suggestion of Dovel and Dovel came from him and was in response to no interrogatory.

Curiosity as to the custody of these photographs may have been heightened by the fact that there were certain

notations on them which the court told the jury to disregard. Dovel and Dovel may be, and probably are, prominent insurance agents in Harrisonburg, and that fact may have been known to some of the jury. All of this is but surmise. The plaintiff did not undertake to show it.

It is said that the cross-examination of Mr. Gaines was intended also to bring out that he had been insured, and we are referred to this excerpt to support that claim:

"Q. Mr. Gaines, you now state that the reason you were on the west side of the road when this accident occurred was because you were forced into that position in an effort to escape this collision. When did this defense first occur to you?

"A. That is what happened.

"Q. Did you tell your attorneys about this immediately following the accident?

"A. I did not talk with any attorneys following the accident.

"Q. When you first consulted your attorney about this— when did you first consult him?

"A. When they filed the suit.

"Q. Never talked with him?

"A. Not any particular—nothing definite.

"Q. You mean to tell me that you did not—

"A. No lawyer.

"Q. You mean that no lawyer talked to you about the case at all—had not gone over it with you?

"A. No.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Did you discuss the facts of the case with other persons who were interested in the legal end of it?

"Objected to and objection overruled. No answer.

"Q. Did you, right following that, discuss the question of liability in this case?

"A. With whom?

"Q. I have no one in mind.

"Objection here sustained.

\* \* \* \* \* \* \* \* \* \*

"Q. Did you, following this accident and before the suit was brought, talk with lawyers representing you or with other persons interested in preparation of your legal defense?

"A. I talked to no lawyers about it, until after.

"Q. Did you tell them at that time about your being on the left side of the road?

"A. Yes."

The substance of it all is that a defendant on cross-examination was asked to whom he had talked about the case—an almost inevitable inquiry in damage suits. Moreover all negligence was at first denied. Gaines' statement of defense was prepared in a workmanlike way, but it gave no indication that "sudden emergency" was to be relied upon. That only appeared in the progress of the trial. It was legitimate to develop the reasons therefor and the advice, if any, which led to its adoption. Certainly there is nothing here to suggest that an insurance company was interested.

On Thursday afternoon the evidence appeared to be all in. The court said: "Is that all, gentlemen?"

"Mr. Paul: I think so.

"Mr. Curry: I suppose so, although there might something else occur, I don't know."

Notwithstanding this *locus poenitentiae*, the evidence was then supposed to be all in. The court thought that both sides had finally rested and so stated from the bench. From 3:45 p. m. there was an adjournment over to 9:30 the next morning, to the end that instructions might be prepared and submitted. When court reconvened on Friday morning, counsel for Gaines said that he had by chance in the intervening time come across two witnesses, Mrs. Armentrout and Mrs. Snyder, that he wished to call them to impeach the testimony of Opal and Carl Grant and wished to recall Opal and Carl Grant that he might lay a foundation for their impeachment. Upon inquiry it was ascertained

that the Grants had returned to their home in Bedford, having been told by plaintiff's counsel that they would not be again needed. These men had not been present under any process of court but came of their own accord, since they too, in independent actions, were seeking to recover damages of the defendant. When it was found that their cases would not be reached, and when they were told that they might go, they went.

Over the objection of the plaintiff, Mrs. Armentrout was then called as a witness. She said that she knew the Grants and had known them for a short time, that they came to her home after they were discharged from the hospital. It will be recalled that Opal remained insensible for twelve days and Carl for twenty-four hours. Her examination proceeded:

"Q. Did you ever go with these boys to the scene of this accident?

"A. Both of them.

"Q. How did you happen to go with them?

"A. The family all stayed at my house and when Carl got out of the hospital he said he wanted to go and see where it was and I went with the family and we taken Opal in the car after he got out.

"Q. Did they go together?

"A. No.

"Q. Carl went to your house?

"A. Yes, sir.

"Q. You took him out there?

"A. Yes, sir.

"Q. Why did you take him?

"A. His father and mother were there and Carl wanted to go out to view the accident—wanted to see it—he said he did not remember much about it and wanted to see it.

"Q. Did he remember anything about it when he got out there and looked the situation over?"

A motion to reject this testimony was renewed and sus-

tained.  Court then retired to chambers, whereupon counsel said:

"If I were allowed to introduce these two witnesses, I would be able to show by them, if they had been allowed to answer, Mrs. Armentrout would have stated that Carl Grant stated on the ground that he had no recollection about anything in the world that happened; did not know whether he had stopped at the stop signal; did not remember seeing the defendant's car and recalled nothing about the collision; and that afterwards she went on the ground with both of the boys, Opal and Carl Grant, and neither of them remembered anything in the world about the accident or any occurrence relating to it and I urge that it would be extremely hurtful to the defendant not to be allowed to introduce this evidence without laying the foundation for it; since the court will not suspend the case so we may be able to recall the two boys to lay the foundation, I, therefore, urge that it is, of itself, competent evidence to show that neither of the Grant boys remembered anything about the accident or the circumstances surrounding it without a foundation being laid for it by recalling the Grant boys."

When we consider these motions and exceptions together, they amount to this:  The court was asked to recall the Grants that they might be impeached, and it was asked to admit evidence tending to impeach them in the absence of any foundation.  Save in unusual circumstances there must be this foundation.  It is eminently fair and rests on natural justice, and so we are brought to this: Should the Grants have been sent for?  The time within which their presence could be secured was uncertain and therefore there should have been no suspension of the trial except for cogent reasons.

Opal Grant lay insensible for twelve days.  His recollection, as his testimony discloses, is not vivid, and at the end of his cross-examination he was asked this question:  "Q.

And you started up and don't know anything more after you started up? A. No."

It thus appears that this witness had already told the jury about all that Mrs. Armentrout claimed to have heard, there was nothing to be gained by threshing over old straw.

Carl Grant was also knocked into insensibility. It is not unreasonable to suppose that the recollection of these men has improved with the lapse of time and with their recovery from shock. Moreover, when we come to re-examine the record we find it stated in the motion that Carl Grant said he had no recollection about anything in the world that happened; that he had made this statement to Mrs. Armentrout, but Mrs. Armentrout herself had just testified. Her evidence is:

"His father and mother were there and Carl wanted to go out to view the accident—wanted to see it—he said he did not remember much about it and wanted to see it."

Carl's statement to Mrs. Armentrout was not that he remembered nothing about the accident, but that he did not remember much about it, and this is the substance of his evidence on cross-examination. He remembered "seeing the car when it pulled over on our side but I can't remember the crash." He was asked: "Do you remember how it occurred at all?" and answered: "No, sir." The jury saw him and heard him testify. All of this was already before it. Postponement was within the sound discretion of the trial court.

This question was long since considered by our court. The governing principle is well stated in *McDowell's Ex'r* v. *Crawford,* 11 Gratt. (52 Va.) 377, where it is said that a liberal rule should be adopted in the reopening of cases, to the end that all relevant evidence might be presented, but that large discretion was vested in the trial court, and that "an appellate court should seldom interfere with its exercise." To the same effect, see Thompson on Trials, section 248, and 38 Cyc. page 1360, where many cases are cited.

The unadmitted testimony was primary proof of no relevant fact. Its only purpose was to impeach, and to im-

peach statements not necessary to the plaintiff's case. If Carl Grant failed to heed the stop sign on Grace street, that negligence cannot be imputed to decedent. Testimony which tends to place the Gaines car corroborates other evidence.

We find no error here.

The defendant objected to all of plaintiff's instructions, but has since withdrawn his objections to instructions 4 and 7.

The following are the instructions to which objection is made:

"No. 1. The court instructs the jury that the law of Virginia expressly prohibits any person from driving an automobile in such manner as not to have the same under complete control at all times, and declares that driving a car under such conditions will be deemed reckless driving.

"And if the jury believe that at the time of the accident or immediately before, the defendant Gaines was driving his car in such manner as not to have his car under complete control, then he is guilty of negligence as a matter of law. And if the jury believe that this negligence was the proximate cause of the accident or contributed to the accident, they should find a verdict in favor of the plaintiff.

"No. 2. The court instructs the jury that the law of Virginia provides that the driver of an automobile shall drive his car upon the right half of the highway or the street upon which he is driving. And if the defendant, Gaines, in driving north on High street, did not drive his car to the east of the center of said street, then he was negligent in not so doing.

"And if the jury believe that such negligence was the proximate cause of the accident or contributed to it, then they should find a verdict for the plaintiff.

"No. 3. The court instructs the jury that even if they should believe from the evidence in this case that the motorcycle did not stop at the stop sign at Grace street or should believe that the motorcycle entered South High street at a greater speed than allowed by law, or upon the wrong side

of the stop sign, nevertheless the negligence of the driver of the motorcycle in doing any or all of these things is not imputable to other persons riding on the motorcycle and is not a defense in this case.

"And if the jury believe that the defendant, Gaines, was guilty of negligence in the operation of his automobile, either in driving the same upon the wrong side of the street, or in driving his car in such manner as not to have the same under complete control, and that either of these acts on the part of the defendant contributed to the accident which resulted in the death of Mabelle Campbell, then the defendant is liable and the verdict of the jury should be for the plaintiff.

"No. 5. The court instructs the jury that in order to excuse the defendant, Gaines, for driving to the left of the center of the street on the contention that he was confronted with a sudden emergency, they must believe from a preponderance of the evidence that such sudden emergency did, in fact, exist, and that the emergency was brought about through no fault of the defendant himself, and that in turning to the left of the street he acted in such manner as a reasonably prudent and careful person would have done under like circumstances.

"And if the jury believe that such sudden emergency did exist, nevertheless, if they believe that such sudden emergency was caused or contributed to by the manner in which Gaines handled his automobile in approaching the point of collision, or they believe that in turning to the left of the street he did not exercise the degree of care which a reasonably careful and prudent man would have exercised under the circumstances, then the contention that he was acting in a sudden emergency was no excuse and his act in turning to the left of the street was negligence, for which he is liable.

"No. 6. The court instructs the jury that there can be no recovery in this case on the counterclaim filed by Gaines."

We find no error in these instructions as applied to the facts of this case. We have seen that there is no joint enterprise and that the plaintiff's decedent was not negligent. It follows that the defendant is liable, if he was negligent, and if his negligence contributed to her death. All of this was touched upon in our consideration of the evidence.

It may be said in passing that it is difficult to say when an automobile is under "complete control," but that difficulty is not present here. The car in judgment appears to have been under no control. Since there was no contributory negligence, there is no occasion to distinguish between proximate cause and sole proximate cause. A proximate cause makes out a *prima facie* case.

The court refused, over the objections of the defendant, to give instructions B, C, O and P. They are here copied.

"B. The court instructs the jury that if they believe from the evidence that the deceased and her companions on the motorcycle were together engaged in a joint pleasure ride or enterprise, and if the jury further believe from the evidence that the operator of the motorcycle was guilty of negligence and that his negligence contributed in the least to the happening of the accident complained of, then his contributory negligence is imputable to the deceased and her administrator is not entitled to recover in this case.

"C. The court instructs the jury that the deceased was required to exercise care proportionate to the known danger. She could not shut her eyes to danger in blind reliance upon the operator of the motorcycle without assuming the consequences of the omission of such care, and if the jury should believe from the evidence that the deceased did not use such reasonable care, or if the jury should believe from the evidence that the operator of the motorcycle was guilty of negligence which proximately contributed to the accident, and should further believe that the plaintiff acquiesced in the negligent acts of the operator of the motorcycle or had knowledge of the danger and accepted the risks by con-

tinuing on without protest, remonstrance or other effort to reduce such risks, then the jury should find a verdict for the defendant.

"O. The court further instructs the jury that if they believe from the evidence that the defendant, without his fault, was placed in a position of sudden emergency by the negligence of the operator of the motorcycle and that the defendant in this emergency did not act wisely, he was not guilty of negligence in law because in case of sudden and unexpected danger requiring immediate decision as to which of two or more ways of escape should be resorted to, the law makes allowances for errors of judgment, even though it appears that the resulting accident could have been avoided if the party so placed in peril had pursued a different course. For the court tells the jury that where a person without his own fault is suddenly placed in danger by acts of another that he is not required to exercise that degree of ordinary care which would be required of him under ordinary circumstances.

"P. The court instructs the jury that the counterclaim of the defendant in this case is in the nature of an independent suit against the plaintiff, and if they believe from the evidence that the operator of the motorcycle was guilty of negligence and that his negligence was imputable to the deceased, and that the negligence of the operator of the motorcycle was the sole proximate cause of the accident, then the jury should find a verdict in favor of the defendant against the plaintiff and assess such reasonable damages in his favor as the jury may think from the evidence he is justly entitled to recover, not exceeding the sum of ten thousand dollars."

[18] "B" deals with a joint enterprise and should have been rejected. "C" deals with contributory negligence. There was none. "O" with a sudden emergency, which had been sufficiently covered. "P" deals also with imputed negligence. There is none.

We have not followed the assignments of error in their order, but have dealt with all that are of substance.

This case seems to have been fairly and carefully tried. We find in it no reversible error. It is affirmed.

*Affirmed.*