# Wytheville

## T. D. KISER v. CHANNING M. SUTHARD.

June 14, 1934.

Present, Holt, Epes, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*Richards & Richards,* for the plaintiff in error.

*Burnett Miller, Burnett Miller, Jr.,* and *C. W. Carter,* for the defendant in error.

Epes, J., delivered the opinion of the court.

This is an action brought by a notice of motion for judgment by Channing M. Suthard against T. D. Kiser to recover damages for personal injuries which the plaintiff alleges he suffered in an automobile collision between a truck belonging to the defendant and an automobile being driven by the plaintiff. At the time of the collision the truck was being driven by a servant of the defendant, but it stands admitted that the defendant is liable for any negligence of which his driver may have been guilty.

The jury found a verdict in favor of the plaintiff for $7,000, which the defendant moved the court to set aside. The court overruled the motion to set aside this verdict and entered judgment thereon for the plaintiff. To this judgment the defendant has been granted a writ of error.

In his petition the plaintiff in error makes two assignments of error: (1) The court erred in refusing to discharge the jury and declare a mistrial because of an an-

swer made by the witness Stafford to a question pro-pounded to him on cross-examination by counsel for the plaintiff. (2) The court erred in refusing to set aside the verdict of the jury on either one or all of the following grounds; (a) Because the verdict was contrary to the law and evidence; (b) because the verdict was grossly excessive; (c) because the verdict was the result of the statement made by the witness Stafford concerning insurance, which is the subject of assignment of error No. 1.

The first witness introduced by the plaintiff was Stafford. In the course of his cross-examination he testified that certain photographs had been taken of the marks on the road at the point of collision. Counsel for the defendant then asked him this question, to which he made the following answer:

"Q. Were you present at any time that Mr. Delmar Fewell took some pictures of the scene of the accident?

"A. I was present at the time some pictures were made. I pulled in at the time they were making them."

At this juncture counsel for plaintiff intervened and asked the following question, to which the witness made the following answer:

"Q. Who made that do you know?

"A. It was two fellows, supposed to be representing insurance agent, having it done. I do not know who actually took the pictures."

As soon as the witness made this statement counsel for the defendant asked that the court have the jury retire, and then moved the court to discharge the jury and declare a mistrial because of the reference to insurance made in the answer which we have above quoted.

The court overruled the motion, saying to counsel in the absence of the jury: The "actual remark of the witness [was] unsolicited and unresponsive to any question. The court will instruct the jury that it makes no difference whether either party had insurance or wehther they did not, or that the insurance had anything to do with the accident. He said nothing there to indicate that the party

had insurance. I do not think any statement this witness has made could possibly prejudice the jury one way or another."

When the jury returned the court made no statement to it with reference to this evidence; and when it came to instruct the jury the defendant did not ask that any instruction be given with reference to this testimony.

We are of the opinion that the court did not err in refusing to declare a mistrial or in refusing to set aside the verdict on the ground that witness Stafford had made the answer which has been quoted. *Gaines* v. *Campbell,* 159 Va. 504, 166 S. E. 704.

The contention of the plaintiff in error that the verdict was contrary to the law and evidence is based upon a contention that the physical facts show that the accident could not have occurred in the way in which plaintiff testified that it did occur. Upon a careful analysis of the evidence we are of the opinion that the physical facts shown by the evidence do not show that the accident could not or did not occur in the way in which the plaintiff testified that it did.

The evidence is sufficient to sustain the finding of the jury that defendants driver was guilty of negligence, which was the proximate cause of the accident.

The physician who attended Suthard testified as follows with reference to the injuries sustained by him:

"Q. What was his [Suthard's] condition when brought there [to the hospital]?

"A. He was unconscious and having frequent convulsions; had a cut down the back of his head about six inches, a little to the left side of the center. This cut was down to the skull; the tissues around the cut were undermined for a distance of about three inches; in other words, it was loose from the skull for a distance of about three inches. His left ear was nearly severed; might have been some minor scratches and cuts, I do not remember. Those were the main things.

"Q. Was there or not, * * * a fracture of the skull?

"A. The skull was undoubtedly fractured. After he recovered he saw double. Still sees double, which is one very trustworthy sign of a fracture of the skull. He was deeply unconscious. He had the signs and symptoms of fracture of the skull. That was the diagnosis agreed on.

"Q. Does a fracture of the skull affect a man permanently, and if so, how does it?

"A. A fracture of the skull is very often fatal.

"The court: Ask him the question as to this particular wound. One fracture of the skull might have a different effect than a fracture on another part.

"Mr. Miller:

"Q. Doctor, about that ear now. When he came to the hospital it took some skill to get that ear in the condiion it is now, didn't it?

"A. Yes, I will admit that.

"Q. What is the condition of the ear at the present time?

"A. The ear is, I think, in very good condition. It is very much thicker and not exactly in place. Of course, it is numb because the nerves were cut off from it. You are speaking about the external ear, this part (indicating). The ear is thicker; it drops forward a little bit and droops a little, and of course, it has very little feeling in it. Of course, that scar will always be there.

"Q. That will follow him to his grave regardless of how long he lives?

"A. Yes. The position of the ear will probably be permanent. The scar will get better, I think. The position of the ear, I imagine, that has improved all it is going to improve.

"Q. How did that affect his ear—on the inside?

"A. Why, he still has a ringing in that ear. That ear is not normal yet and has not been normal since the accident.

"Q. Will it in your judgment ever be normal?

"A. I do not think I am qualified to answer that. I know very little about ears. I am not an ear specialist.

"Q. About the scar on the back of the head. How long did you tell the jury that scar was?

"A. About six inches.

"Q. That cut went all the way through to the skull?

"A. Yes.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. The result of that injury which caused that scar, how will that affect him?

"A. Do you mean by that the fracture in the skull?

"Q. Yes, sir, the result of the accident.

"A. He has double vision; that is, he sees double. He has to have glasses in order to get his eyes to focus. He has a ringing in this ear (indicating). It is—kind of cross between the wind blowing through the trees and fine bells, 'twixt and between these two sounds. He tells me that he has not gotten back his nervous balance, tires easily and is not quite sure of himself in driving in traffic.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. How long, if you recall, Dr. Hiden, did this patient, Mr. Suthard, stay in the hospital, after he was brought there?

"A. Stayed there; came on the 25th day of September, and left on the 23rd of October, which was exactly, I think, four weeks.

"Q. Were the injuries that he received according to his condition when he was brought to the hospital, Doctor, such as would cause pain and suffering?

"A. Yes, sir.

"Q. Do you know, or did he complain to you of suffering while at the hospital?

"A. Yes, sir.

"Q. How often would you see him while he was there?

"A. I saw him as a rule, twice a day; some days I would only see him once. Some days I may have missed seeing him entirely, after he got better, but as a rule I

saw him twice a day. That is routine, however. I see all of my patients twice a day if I am in town.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. Is his condition such now, Doctor, or not, that he requires medical advice and medical attention, Mr. Suthard, I mean?

"A. Yes.

"Q. Do you know at whose hands, that is, at the hands of what physician, he is receiving attention now?

"A. I am under the impression that his family physician, and an eye specialist. He told me he had been under the care of Dr. Bailey since leaving the hospital, getting his glasses from Dr. Bailey."

██ In view of this testimony we think the court did not err in refusing to set aside the verdict on the ground that it was grossly excessive.

The decision of the trial court will be affirmed.

*Affirmed.*