### CARROLL v. HARRISON et al.
### Civil Action No. 67.

District Court, W. D. Virginia, at Danville.

Jan. 15, 1943.

On Defendant's Motions March 24, 1943.

Aiken & Sanford, of Danville, Va., for plaintiff.

F. Eugene Hester, of Reidsville, N. C., for defendant Lula Harrison.

E. Walton Brown, of Danville, Va., for all defendants.

W. H. Rogers and Mary H. Williams, both of Danville, Va., guardians ad litem for the infant defendants, Henry Harrison and Robert Going.

On defendant's motions:

Aiken & Sanford, of Danville, Va., for plaintiff.

Brown, Garrett & Bass and W. H. Rogers, all of Danville, Va., for infant defendant Henry Harrison.

BARKSDALE, District Judge.

This action having been tried upon the facts by the Court without a jury, the Court doth hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows, in conformity with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c:

### Findings of Fact.

This is an action for damages resulting from a fatal accident which occurred in Pittsylvania County, Virginia, during the afternoon of Sunday, September 27, 1942. At that time, the defendant, Henry Harrison, nineteen years of age, lived with his widowed mother, the defendant, Mrs. Lula Harrison, on a farm near Reidsville, N. C., these two being the only members of the family at home. Together, they operated the farm, and used a 1941 Ford pick-up truck which had been acquired by trading in an old truck belonging to the deceased husband and father, the title to the new truck being taken in the name of Mrs. Harrison because Henry Harrison was an infant. Mrs. Harrison occasionally drove the truck when Henry was absent, but Henry always drove it when he was present and customarily took the truck on Sundays to do what he pleased with it.

On the day in question, September 27, 1942, he left home in the truck about 12 o'clock, noon, and told his mother he was going to town. He went to Reidsville and proceeded to the home of his friend, the defendant, Robert Going, a boy seventeen years of age. Going got in the automobile with Harrison, and they then picked up two other friends, Jesse Jones and Paul Harden, boys of about their own age. All four of them decided to get some whiskey and go to Danville in search of amusement. All four jointly "chipped in", bought a pint of whiskey, and after all of them had drunk some of it, they proceeded to Danville, Henry Harrison driving the car. On the way, they discussed going to a moving-picture show, but had not decided definitely whether they would go to a moving picture or not, and if so which one, when they reached the south side of Danville. Before reaching the business section of Danville, they stopped at Buck's Diner, where they all proceeded to drink more whiskey while they were having something to eat. They all became drunk and disorderly. At first, they all refused to pay their bills, and then one of the boys paid all the bills. A City policeman then came in one door of the diner, and the four boys left by another door, scrambled into the automobile, and left very hurriedly, although the policeman whistled and tried to stop them. They went some distance in one direction, but as some of them wished to go in the opposite direction, they turned around and came back by Buck's Diner. The same policeman again tried to stop them by use of his whistle and signals, because he had observed that Henry Harrison, who was driving, was too drunk to drive. However, the policeman's efforts to stop them were unavailing, so he commandeered the automobile of a bystander and chased the boys past the city limits. During this chase, the boys gained a distance of two city blocks, although the policeman drove as rapidly as fifty miles per hour. After riding around some more, the boys decided they wanted more to drink, and drove to a filling station and drink stand operated by one Spencer near the North Carolina line. According to the defendant, Henry Harrison, when they reached Spencer's place, it had not yet been definitely determined whether or not they would go to the moving pictures, but that they would go if the majority so desired. When the automobile was stopped at Spencer's place, Harrison and Harden got out, Going and Jones remaining in the car. The switch key, which was bent and difficult, or impossible, to remove, was left

in the car. At that point, Going decided that he would drive into town and see what shows were going on at the moving picture houses and return while Harrison and Harden were drinking in Spencer's place, so that they might all determine whether they wanted to go to a moving picture show, and if so, which one. As Harrison was walking away from the car, and while he was yet in easy hearing distance of it, Going said to him, "I'm going down the road", to which Harrison made no reply, and Going turned the car around and proceeded toward Danville. (Harrison testified that he heard Going say that he was going down the road and would be back in a few minutes, to which he replied, "Wait a minute, and I'll be ready too." However, I choose to believe Going's statement that Harrison made no reply and raised no objection.) Harrison made no effort to stop Going. At that time, Going was too much under the influence of liquor to operate an automobile with reasonable safety, and Harrison knew this, or should have known it unless he himself was also too drunk to observe. Going had a driver's license, as Harrison knew, and on a number of occasions before, had driven this car when he and Harrison were together, and on at least one occasion recently, had driven the car alone with Harrison's consent and approval.

Leaving Spencer's place, Going, accompanied by Jones, proceeded into Danville, or to some point between Danville and the Pumpkin Creek Bridge on the Yanceyville Road (U. S. Highway No. 86), and on his way back, collided with the Plymouth automobile operated by plaintiff's decedent. (In his testimony, Going insisted that the collision took place as he was driving toward Danville, but the evidence is overwhelming that he was traveling south, away from Danville, when the accident occurred, and I consider his confusion about the direction in which he was traveling at the time, as a further indication of his drunkenness at that time.)

Going operating the Harrison car, accompanied by Jones, proceeded down a hill south along Highway No. 86 toward a bridge over Pumpkin Creek. The Plymouth automobile operated by plaintiff's decedent approached from the opposite direction. Highway No. 86 at this point is a three-lane improved highway, and plaintiff's decedent operated his car at a moderate rate of speed, in the right-hand lane of traffic in the direction in which he was going, and was guilty of no negligence whatsoever. Immediately prior to the collision, Going passed another automobile, occupied by three negroes, which was going in the same direction he was going, at an excessively high rate of speed, lost control of his car, drove it across the road, into the left-hand lane of traffic in the direction in which he was going, and collided head-on with the Plymouth car operated by plaintiff's decedent, almost instantly killing plaintiff's decedent and his own companion, Jesse Jones, rendering himself unconscious and completely demolishing both cars. This collision resulted solely from the negligence of Going.

Plaintiff's decedent, Robert Harding Tazewell Carroll, was twenty-nine years of age, had been married to plaintiff, who is twenty-one years of age, some three or four years, and they had one child, a daughter then two years old. He was in good health, a good husband and father, gainfully employed at the Riverside & Dan Cotton Mill, and was earning at that time about thirty dollars a week. His total earnings for the year 1941 were $959.05, and for 1942 up until the time of his death on September 17, 1942, were $855.57. According to standard mortality tables, he had a life expectancy of 36.03 years.

### Conclusions of Law.

My conclusions of law upon the above findings of fact are as follows:

(1) That the accident which resulted in the death of plaintiff's decedent, was the direct result of the negligence of the defendant, Robert Going, and that plaintiff's decedent was free from contributory negligence. I therefore conclude that the said Robert Going is liable for damages to plaintiff for the injuries sustained by her.

(2) That during the Sunday afternoon excursion here under consideration, the defendant, Henry Harrison, left his home in full and complete charge and control of the automobile here in question, with the permission and approval of his mother, the registered owner, and, therefore, that at and before the time of the accident, the said Henry Harrison stood in the place and stead of the owner of the automobile for the time being. Therefore, under Virginia law, which is here controling, there was a prima facie presumption that at the time of the accident, the automobile in question was being oper-

ated by Going for the defendant, Henry Harrison, under circumstances making him, the said Henry Harrison, liable for the consequences thereof. The burden of refuting this presumption was on the defendant, Henry Harrison, which burden he has not borne. I, therefore, conclude that the said defendant, Henry Harrison, is jointly and severally liable with the said defendant, Robert Going. Kavanaugh v. Wheeling, 175 Va. 105, 113, 7 S.E.2d 125.

(3) That no relationship of master and servant existed between the defendant, Lula Harrison, and the defendants, Henry Harrison and Robert Going, or either of them, and that therefore there can be no recovery in this action against the said defendant, Lula Harrison.

(4) That under Virginia law, where two or more persons embark upon an excursion by automobile, having a community of interests in the objects or purposes of the undertaking, and an equal right, or some voice and right, to be heard in the control and management of the automobile and to direct and govern the movements and conduct of each other with respect thereto, such excursion constitutes a joint enterprise, during the course of which each participant is the agent of the other while operating the said automobile for the accomplishment of the common purpose. Ordinarily, the determination of whether or not a given set of circumstances constitutes a joint enterprise is a question for the jury. Having heard this case without a jury, it is my conclusion, upon the facts and the law, that this Sunday afternoon excursion constituted a joint enterprise, with the result that at the time of the accident, the defendant, Robert Going, was the agent of the defendant, Henry Harrison, and acting within the scope of his authority. It therefore follows that the said defendant, Henry Harrison, is liable jointly and severally with the said defendant, Robert Going. Washington & O. D. R. Co. v. Zell's Adm'r, 118 Va. 755, 88 S.E. 309; Gaines v. Campbell, 159 Va. 504, 166 S.E. 704; Stallard v. Atlantic Greyhound Lines, 169 Va. 223, 230, 192 S.E. 800; and Carroll v. Hutchinson, 172 Va. 43, 53–56, 200 S.E. 644.

(5) That said defendant, Henry Harrison, was guilty of negligence which was a proximate cause of the accident, when he, knowing that defendant, Robert Going, was under the influence of liquor and incompetent to drive an automobile

with reasonable safety, permitted him to operate the automobile here in question. Crowell v. Duncan, 145 Va. 489, 134 S.E. 576, 50 A.L.R. 1425; Hackley v. Robey, 170 Va. 55, 67, 195 S.E. 689; see, also, note, 120 A.L.R. 1311.

(6) I further conclude that plaintiff is entitled to recover of the said defendants, Henry Harrison and Robert Going, the sum of $12,500, as reasonable compensation for the injuries sustained by her by reason of their negligence.

It follows, therefore, that an order will be entered directing a verdict in favor of defendant, Lula Harrison, and rendering judgment in the sum of $12,500 against the defendants, Henry Harrison and Robert Going, with interest and costs.

On Motions of Defendant Henry Harrison.

This action having been tried upon the facts by the Court without a jury, the Court filed its Findings of Fact and Conclusions of Law and entered final judgment in favor of the plaintiff against the defendants, Henry Harrison and Robert Going, on January 7, 1943. Subsequently, on January 22, 1943, defendant, Henry Harrison, an infant, by his counsel and his guardian ad litem, filed, in writing, his motion for a new trial and his motion that the Court amend its findings of fact and conclusions of law thereon and enter final judgment in his favor, upon numerous grounds set out in these motions. Oral argument has been heard, and written memoranda on behalf of both plaintiff and defendant have been considered.

Only two of the grounds assigned by the motions give me any concern.

In my Findings of Fact and Conclusions of Law heretofore filed, I found the defendant, Henry Harrison, guilty of primary negligence in permitting the defendant, Robert Going, to operate the automobile here in question at the time of the fatal accident, when defendant Harrison knew, or was charged with notice, that Going was under the influence of liquor to such an extent as to render it unsafe for him to operate the automobile. In his motion for a new trial, defendant, Henry Harrison, not only challenges the correctness of this holding on the merits, but contends that this issue was not included in the pleadings, not properly before the Court, and that he was prejudiced by going to trial without notice that this issue would be considered. It is true that the issue of Henry Harrison's primary negligence as

abovementioned, was not definitely made by the pleadings, nor was it included in the pretrial order. However, I am satisfied that the evidence, to which no objection was taken, clearly presented this issue, that it would be an injustice to the plaintiff not to make a finding on it, and that Rule 15(b) of the Federal Rules of Civil Procedure, as construed in Swift & Co. v. Young, 4 Cir., 107 F.2d 170, authorizes and permits the court's determination of this issue, provided that such determination has not prejudiced the defendant in his defense upon the merits. At the oral argument, and thereafter, defendant's counsel stated that the way, and the only way, which the defense of his action was prejudiced was that the defendant did not at the trial have the benefit of the testimony of one Paul Harden. Inasmuch as I was satisfied that the testimony of Paul Harden would be material and competent, I was of the opinion that the defendant Henry Harrison had the right to produce Paul Harden as a witness in his behalf, or to take his deposition if his personal appearance could not be procured. Since the argument on these motions, it has appeared that it will be impossible to procure the personal attendance of Paul Harden as a witness, or to take his deposition, by reason of the fact that he is a member of the armed forces and has recently departed for an unknown destination. However, it has been stipulated by the parties that a sworn statement of Paul Harden, which has recently been filed, may be considered by the Court as his evidence on the question of the alleged primary negligence of Henry Harrison in connection with Robert Going's use of said motor vehicle.

Pursuant to this stipulation, the Court has carefully considered the statement of Paul Harden, which by order will be made a part of the record, treating it as his evidence, in connection with the evidence already heard in open court on this question. Although Paul Harden's statement tends to support defendant Henry Harrison's denial of such primary negligence, I am of opinion to adhere to my former conclusion that Henry Harrison was guilty of such primary negligence as to justify a judgment against him. As defendant, Henry Harrison, assigned no other particular in which he has been prejudiced by the determination of this issue of primary negligence, his motion for a new trial upon this ground will therefore be denied.

In his motion for amendment of findings of fact and conclusions of law and for a final judgment in his favor, defendant Henry Harrison assigns another ground, which is worthy of consideration. In my Findings of Fact and Conclusions of Law heretofore filed, I concluded that Henry Harrison, an infant between nineteen and twenty years of age, Robert Going, an infant between seventeen and eighteen years of age, and their two companions, were engaged in a joint enterprise, so that at the time of the fatal accident, Robert Going, who at that time was operating the automobile in question, was the agent of defendant Henry Harrison so as to render both defendants, Harrison and Going, liable for the resulting damages, notwithstanding the fact that Henry Harrison was not present in the automobile at the time of the fatal accident. In his motion, defendant, Henry Harrison, not only challenges the correctness of my conclusion that at the time of the fatal accident he was a member of a joint enterprise with Robert Going and others, but also contends that even if he was a member of a joint enterprise, he cannot be held liable for the negligence of Robert Going, by reason of the fact that such liability could only be predicated upon the relationship of principal and agent, and that he, as an infant, was legally incapable of the appointment of an agent, and therefore cannot be held liable, even in a tort action, for the negligence of such agent.

 Of course, under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, this question calls for the application of Virginia law, as the sole ground of Federal jurisdiction here is diversity of citizenship, and so far as I have been able to ascertain, the question is of novel impression in Virginia. Although there seem to be no cases directly in point, it would seem profitable to consider such Virginia cases as have a bearing on the question here involved.

In Virginia, it is held that: "An infant can be held liable for a fraud or a tort, but not, in general, on a contract express or implied." Saum v. Coffelt, 79 Va. 510. See also Fry v. Leslie, 87 Va. 269, 12 S.E. 671. And it is held that, as a general rule, an infant lacks legal capacity to appoint an agent, so as to render the infant liable for the acts of such agent. Mustard v. Wohlford's Heirs, 56 Va. 329, 15 Grat.

329, 76 Am.Dec. 209; Dellinger v. Foltz, 93 Va. 729, 25 S.E. 998. It is to be noted, however, that in both of these last cited cases, the courts were dealing with situations involving the sale of real estate, where the agents had performed acts which their infant principals clearly lacked legal capacity to do themselves. Of course, it is held in Virginia, as it probably is universally, that in the absence of fraud, an infant is liable on his contract for necessaries.

Besides their right to contract for necessaries, there are a number of instances where infants under twenty-one years of age are permitted by statute in Virginia to make binding contracts notwithstanding infancy. In Strother v. Lynchburg Bank, 155 Va. 826, at page 832, 156 S.E. 426, at page 428, 73 A.L.R. 166, the Court said:

"It was competent for the Legislature to fix an age limit less than twenty-one years and invest the infant with an unrestricted ability to contract. In fact, the Legislature exercised its prerogative in this respect.

"Section 5338a provides that an infant wife or husband may dispose of their dower or curtesy rights in the consort's property.

"Section 6108 provides that an infant transacting business as a trader, who shall fail to disclose his infancy, by specific methods set out, shall be liable for his debts to the extent of the property acquired or used in such business, and no plea of infancy shall be allowed.

"Section 2851 provides that an infant 18 years of age or over may be appointed as a notary public and enter into the bond required; and that such notaries shall be liable for their official acts and omissions as if they were of full age.

"Section 5228 provides that an infant 18 years of age or over may dispose of personal property by will."

Besides these instances, Section 2154 (176), Code of Virginia 1942, provides that an infant more than fifteen years of age, after complying with certain requirements, may operate an automobile upon the highways of the Commonwealth, and Section 2154(173) thereof provides that an infant resident of another state, who is over sixteen years of age and licensed by his home state, shall be permitted to drive upon the highways of this state.

In Stallard v. Sutherland, 131 Va. 316, at page 318, 108 S.E. 568, at page 569, 18 A.L.R. 516, the Court said: "In cases like this, it is proper to remember the oft-quoted language of Lord Mansfield in Zouch v. Parsons, 3 Burr. 1802, 1 W.Bl. 575: 'A third rule deducible from the nature of the privilege, which is given as a shield, and not as a sword, is that it never shall be turned into an offensive weapon to assist fraud and injustice.'"

In this case, an infant, nineteen and a half years of age, who by his actions and appearance seemed to be at least twenty-one years of age and so represented himself, executed a deed of trust upon real estate, and after attaining his majority sought to repudiate same. The Court, in refusing to decree repudiation, said (131 Va. at page 324, 108 S.E. at page 571, 18 A.L.R. 516): "Without prolonging the discussion, it is sufficient to say that we prefer to follow, in this conflict in the American cases, that line which tends to discourage and prevent fraud, and which is in accord with equitable doctrines. This infant, who was managing his own business just like an adult, whose appearance indicated that he had attained his majority, who falsely misrepresented his age, who was intelligent enough to appreciate the fraudulent scheme and in conjunction with his brother to attempt its execution, should not be aided by a court of equity to consummate such fraud."

The case of Clinchfield Coal Corp. v. Couch, 127 Va. 634, 104 S.E. 802, 13 A.L.R. 398, was another instance where the Virginia Court refused to permit an infant, after attaining his majority, to do an injustice to another party with whom he had contracted. The infant, during infancy, compromised a claim for damages for personal injuries, and after majority, sued for damages notwithstanding his release executed during infancy. The Court permitted him to repudiate his release, but required him to credit his claim with the amount paid to him under the compromise agreement, and said, 127 Va. at page 637, 104 S.E. at page 802, 13 A.L.R. 398: "The rule in cases like this may be thus stated: When an infant has compromised his claim for damages for a personal injury and executed a release of his cause of action, he may, after he attains his majority, repudiate such compromise and recover just damages, but he must credit thereon the sum which he received by way of compromise and settlement."

I find no Virginia cases bearing more closely on the question here involved.

The precise question here involved has been considered by courts of other jurisdictions, and it is generally, although not universally, held that under such circumstances as exist here, the infant cannot be held liable for the torts of his agent. Potter v. Florida Motor Lines, Inc., D.C.S.D. Fla., 57 F.2d 313; Hodge v. Feiner, 338 Mo. 268, 90 S.W.2d 90, 103 A.L.R. 483, note beginning on page 487 and cases therein cited.

However, in the cases of Wilson v. Moudy, 22 Tenn.App. 356, 123 S.W.2d 828, and Haynie v. Jones, 233 Mo.App. 948, 127 S.W.2d 105, under circumstances quite similar to those here involved, infants riding in automobiles operated by their agents, were held liable for damages to others resulting from the negligence of the agent operators. These decisions are based, however, not upon the existing relationship of master and servant, but upon the fact that the infant principals were in the cars at the times of the accidents and had the right to control the operation, although the actual operation was being done by their agents.

In the case of Ahlstedt v. Smith, 130 Neb. 372, 264 N.W. 889, at page 891, it was held that: "A minor, who occupies an automobile, and engages in the prosecution of a joint enterprise with another who drives, may be liable for the negligence of the driver."

In holding the infant liable, the opinion does not clearly indicate whether the Court's decision to hold the infant liable is based upon the relationship of agency arising from the joint enterprise, or upon the fact that the infant was present in the automobile with the right of control. However, the language of the opinion rather indicates the former.

In Smith v. Kron, 96 N.C. 392, 2 S.E. 533, 536, an action for damages for trespasses upon land by infants, the court, stating that it was not necessary to decide the point in disposing of the appeal, approved the trial court's ruling that infants, not being able to make binding contracts except for necessaries in a proper case, were incapable of forming such a relation with agents as to render them liable for their torts done in prosecuting the objects of the alleged agency, but said: "If the instruction goes beyond the liability growing out of and inseparable from the relation of principal and agent formed by contract, positive or implied, and protects the infant of sufficient intelligence and judgment from accountability for torts involved and done in the necessary prosecution of the business of the agency and the attainment of its ends, we are not prepared to concur in its correctness in law. We do not see why the rule in such case, qui facit per alium facit per se, does not apply."

In Masterson v. Leonard, 116 Wash. 551, 200 P. 320, the negligence of another infant operating a bicycle, was imputed to an infant plaintiff, twelve years of age, who was also on the bicycle, in an action against a third party with whom they collided, by reason of the fact that the two infants on the bicycle were engaged in a joint enterprise, citing the Virginia case of Washington & O. D. R. Co. v. Zell's Adm'r, 118 Va. 755, 88 S.E. 309, amongst others, as authority for its conclusion that the infants were engaged in a joint enterprise. The question of an infant's liability for the negligence of his agent, is not discussed in terms in this opinion, but the conclusion of the Court is definitely based upon the finding that the infant plaintiff was liable for the acts of his agent, the relationship of agency having arisen from their joint enterprise or adventure.

In holding an infant owner of a store building not liable for the negligence of the janitor thereof, the Court, in its opinion, in Covault v. Nevitt, 157 Wis. 113, 146 N.W. 1115, at page 1118, 51 L.R.A.,N.S., 1092, Ann.Cas.1916A, 959, says: "Counsel for respondent cites us to Labatt on Master and Servant, where the idea is advanced that an infant ought to be held liable for the acts of his servant in the course of his employment. Labatt's Master and Servant (2d Ed.), vol. 1, p. 379. The learned author, however, cites no authority to support the position, and admits that there is a singular dearth of judicial authority respecting the points. He does not attempt to meet the elementary doctrine that the relation of master and servant does not exist between an infant and his servant. Nor does he refer to the universal doctrine that infants can be held on voidable contracts only to the extent of the benefits received. All we have is the statement of the learned author, which, indeed, standing alone, is entitled to great respect, but we do not feel that it can outweigh principle and authority against it. Mr. Labatt, however, frankly admits the authorities are not with him, and does not take a decided

position, but suggests an argument on the point."

The full text of the discussion of this question referred to by the Court is as follows:

1 Labatt's Master and Servant, 2nd Ed., 378:

"109. Contracts made by infants as employers.—The general rule as to the obligatory character of an infant's contracts for necessaries logically involves the corollary that a contract by him for the hire of a servant suitable to his station in life is binding upon him, to the extent at least of rendering him liable for the compensation earned by the servant. This is the doctrine of the English courts. But the position taken by the supreme court of New York is that such a contract is voidable.

"In cases where the rule as to necessaries is not controlling, the effect of such a contract is somewhat obscure. Upon the analogy of the doctrine applied in respect to other contracts, it would seem that the contract of an infant for the hire of a servant should, if not clearly prejudicial, be regarded as being merely voidable at his own option, and that, until it has actually been disaffirmed by him, it should be deemed to subsist for all purposes, both as between himself and the servant, and with reference to third persons. This theory as to the juridical situation would involve the following consequences: That he will be liable for any wages earned while he has treated the contract as valid, —at all events for such wages as were already due and payable at the end of the last of the periods with reference to which their amount was measured; that a ratification of the contract after he has attained his majority will preclude him from repudiating it thereafter; that he will be entitled to maintain an action for damages against a third person who interferes wrongfully with the contract by enticing away the servant, or otherwise; *and that he will be answerable for such torts as might be committed by the servant in the course of his employment.* There is, however, a singular dearth of judicial authority respecting the points thus indicated. In the only case which has come to the notice of the present writer, the validity and effect of an ordinary contract by an infant for the hire of a servant has been treated as being determinable not by the general rule which serves to differentiate his voidable from his void contracts, but by the

more specific rule which defines the extent of his power to appoint an agent. The decision referred to proceeds upon the theory, adopted by many American courts, that an infant is incapable of making a valid appointment of an agent, this theory being considered to involve the corollary that his appointment of a servant must be treated as void in such a sense that he cannot be held liable for injuries caused by the negligence of the appointee." (Italics mine.)

And further, in Footnote No. 3, page 379, the author continues: "Burns v. Smith (1902) 29 Ind.App. 181, 64 N.E. 94, 94 Am.St.Rep. 268. The court refused to infer any higher degree of liability from the fact that the infant was married. The conclusion arrived at was fortified by a quotation from the following passage from a standard treatise: 'As the doctrine respondeat superior rests upon the relation of master and servant, which depends upon contract, actual or implied, it is obvious that it can have no application in the case of an infant employer, and he therefore is not responsible for torts or negligence by those in his service.' Cooley, Torts, 2d ed. p. 128. It should be observed, however, that the only authority cited in support of this statement is a decision by one of the lower courts of New York. Robbins v. Mount (1867) [27 N.Y.Super.Ct. 553] 4 Rob. 553, 33 How.Prac. [24] 34. Moreover, the ratiocination of the learned author seems to be open to the objection that it assumes all contracts of employments made by infants to be void, and not merely voidable. It is submitted that the liability of an infant for a tort must be determined with reference to the situation existing at the time when the tort was committed, and that, if the contractual relationship between him and his servant was allowed by him to continue up to that time, he cannot relieve himself from responsibility for the servant's act by a subsequent repudiation of the contract. Moreover, even as respects the validity of appointments of agents by infants, it is impossible to state the rule in the unqualified form which is required to sustain the decision in the Indiana case which we are considering. It is unquestionable law, that an infant may appoint an agent to do an act which is clearly to his advantage. Story, Agency, Sec. 6; Evans, Principal & Agent, p. 13; Mechem, Agency, Sec. 54. On the whole, therefore, it is submitted that this case, and the authorities upon which it is based, have left

the rights and liabilities of an infant master in many important respects an open question, which is sorely in need of further judicial discussion."

The reasoning of the author seems sounder to me than the Court's commentary thereon, quoted above.

 Of course, I have no quarrel with the cases which hold that an infant's apointment of an agent to do something which the infant himself lacks legal capacity to do, is void or voidable; and I realize that in numerous instances the courts have said dogmatically that while an infant is liable for his own torts, he is not liable for the torts of his agent. In cases where the agency is for the doing of something which the infant is legally incapable of doing, this statement seems to me to be correct, but in the situation where an infant does, through his agent, something which he is entirely capable of legally doing himself, I can see no reason why he should not be liable for the torts of such agent within the scope of his authority. An infant is liable for necessaries. If such infant, being indisposed, sent his servant to the grocery store, and through the agent purchased, on the credit of the infant, bread and meat for his sustenance, surely it would be absurd to say that the infant would not be liable for these necessaries because the liability therefor arose through the instrumentality of an agent. And if the servant drove the infant's automobile on this errand, as the infant himself (assuming him to be over fifteen years of age and possessed of a Virginia operator's license) had a perfect legal right to do, why shouldn't the infant be liable for his agent's negligence while thus acting for the infant, who would assuredly be liable for his own negligence if he were driving?

 It seems to me that the courts, in cases such as Hodge v. Feiner, supra, which refuse under such circumstances as here prevail to hold the infant liable for the torts of his agent, not only lose sight of the general principle stated in 2 Corpus Juris Secundum, Agency, § 13, page 1040, that: "Capacity to be a principal depends on whether the act to be done by the agent is within the capacity of the principal if he were present.", but, in blindly applying the general principle that an infant is not legally capable of appointing an agent, lose sight of Saint Paul's ancient, but apt,

observation that, "The letter killeth but the spirit giveth life." 2 Corinthians 3:6.

From the facts already found, it is to be assumed that Henry Harrison, the infant defendant here, had a North Carolina drivers' license, as the evidence showed that he drove the automobile here in question continuously in that state. He was more than nineteen years of age, and therefore by statute in Virginia he had a perfect right to drive the automobile on the highways of this state and to perform the mission upon which his agent Going was engaged at the time of the fatal accident. To relieve Harrison of responsibility for the acts of his agent here by reason of his infancy, would seem to me to permit him to use his infancy as a sword to injure the widow and child of plaintiff's decedent, rather than as a shield to protect him from injustice.

It is therefore my conclusion to overrule the motion of defendant, Henry Harrison, for amendment of findings of fact and conclusions of law and for a final judgment in his favor, and an order will be entered accordingly.