## Richmond

NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY V.
T. HELM JONES, ADMINISTRATOR, ETC.

January 15, 1945.

Record No. 2861.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston
and Spratley, JJ.

The opinion states the case.

*Willcox, Cooke & Willcox*, for the plaintiff in error.

*Leigh D. Williams* and *T. Helm Jones*, for the defendants in error.

HOLT, J., delivered the opinion of the court.

W. G. Shaner & Sons were contractors and were working for the Belt Line Company on the morning of the accident, August 21, 1943, and had on other occasions done work for it. The Belt Line is a railroad operating in the Norfolk area and furnishes convenient means of transfer from one

through line of railroad to another and from the dock on Elizabeth river to them.

Shaner had been in business relations with the Belt Line for some time prior to the accident. He had made a contract for construction work in three different yards of the defendant, all of which contracts had been completed prior to the accident. On August 5th, the Belt Line Company wrote to Shaner, saying that it desired to make use of one of his gangs for general maintenance work, pay to be on the basis of a six-day week, with time and one-half overtime for Saturdays.

Reynards, who was paymaster for Shaner, and whose purpose on this occasion was to pay off his men, came down from the east and was struck by a thrown rail just as he had reached the defendant's car. When he was struck 48 rails from a carload of 90 had been thrown out. Shaner's men, who then were about 100 feet behind the train, would pick up these rails and place them on the ends of the cross-ties.

On the date of the accident, which was Saturday, this Belt Line was unloading rails to replace existing rails on Track No. 5. The train from which this was done consisted of a locomotive, next a car loaded with joints and bolts, and then three gondola cars—one or all of them loaded with rails. The train itself moved from the water front to the east. Whether the engine was definitely headed east or west we do not know.

Shaner's crew consisted of fourteen men, who reached the Belt Line yard for work at eight o'clock. Later, whoever was in charge of the Belt Line asked for help and two of Shaner's men were assigned to a Belt Line gondola. Actual unloading began a little after nine o'clock. Plaintiff's decedent, Reynard, was injured about ten o'clock.

These rails were 39 feet long and weighed 100 pounds to the yard. There were 20 or 22 men, including the two from Shaner, on the car which was being unloaded and all were under the control of a foreman named Wilkins.

This was the method of unloading: Starting at the water

front, a rail was dropped out on one side of the car, then the train was moved forward half a rail length, then a rail dropped out on the other side; the process was repeated, the train moving forward one-half a rail length after each rail was dropped, only one rail being dropped at a single stop.

Andrew King, colored, a witness for the defendant, gives us this account of what the workmen did and what Wilkins, the foreman, did:

"After the train moved down, we stopped, see, and Mr. Wilkins would go to the side to see who was coming down the pathway, to see if everything was all right. So, after he goes and looks and walks back, then we get the rail, see, and the man on the end, he does the talking; we all listens to him."

Robert Nevells, colored, another witness for the defendant, said:

"Then, after he (Wilkins) looked and saw the coast was clear, he would back out of the way. I was working on the end, and in order to throw that rail away he would have to back up. He would go and look over the side, and if it was no one there and the way was clear, he would call to Mac and he would tell us to throw it away; so, when Mr. Wilkins would look over, if he didn't see anybody coming, he would say, 'All right, Mac.' "

The defendant recognized the duty which rests upon it. Wilkins, the foreman, undertook to look. Manifestly he performed that duty in a highly inefficient way. It was not reasonably effective, and it was not effective at all.

The rule is thus stated in *Shuster* v. *Virginia Ry., etc., Co.*, 144 Va. 387, 132 S. E. 185:

"Had he looked, when looking would have been effective, he must have seen the approach of the car.

"In *Washington Southern Railway Co.* v. *Lacey,* 94 Va. 460, 26 S. E. 834, it is said: 'The mere fact of looking and listening is not always a performance of the duty incumbent upon the traveler, for he must also exercise care to make the act of looking and listening reasonably effective. He

must not approach the track at such a rate of speed that when he reaches a point where he can see or hear the train it is too late to protect himself from injury. He must exercise ordinary care in attempting to cross or in crossing the track, and care is never ordinary care unless it is proportionate to the known danger.' "

The question as to whether Reynard was an invitee or a licensee has been earnestly and ably discussed. The court thought that he was an invitee, and for these reasons: Under Shaner's contract with the Belt Line he was to be paid a stipulated sum for the time each man was at work and, in addition, was to be paid time and one-half for overtime. Reynard was superintendent, timekeeper and paymaster, and so he was an invitee just as was each member of his crew. It had been his custom to pay them on the job and this the Belt Line knew, for he had, on at least three other occasions, worked for it and had been at work on the present contract for between two and three weeks. Saturdays were pay days. With this knowledge at hand, the Belt Line took that distinguishing characteristic accorded to such a class. It exercised the duty of prevision and placed a watchman on duty to look out for him.

In this case there is little difference between the rights of an invitee and a licensee.

Reynard was killed on a walkway, used indiscriminately by men going to and from the dock at Sewell's Point, and it just chances that it was a walkway which led directly to where Shaner's men were at work; and, indeed, was the only direct walkway from Hampton Boulevard to that point.

In such circumstances we are told the rights of a licensee:

"These damage cases are without number. They shade into each other, and it is not always easy to draw a line of demarcation. Neither as to bare licensees nor as to trespassers is there any duty of prevision. Preparations for their discovery are not necessary, and it is not necessary to have a lookout on the front car, for such would be a preparation for their discovery. But where the roadbed is used as

a walkway by many people, when this fact is known, reasonable care is necessary—headlights are not; a special lookout is not, neither are movements in any particular manner, for, as we have seen, prevision is not required. What is reasonable care, with facilities at hand and under circumstances as they exist, is, within fair limits, a jury question. Here a man was stationed on the forward car. He tells us that his duty was to keep a lookout, and so we have the construction which the road itself placed upon its duty. A lookout's duty is to look, and his negligence should be charged against the master." *Hawkins* v. *Beecham*, 168 Va. 553, 191 S. E. 640.

A lookout's duty is to look, and this we have held time out of mind. *Washington Southern Ry. Co.* v. *Lacey*, 94 Va. 460, 26 S. E. 834; *Shuster* v. *Virginia Ry., etc., Co.*, 144 Va. 387, 132 S. E. 185.

We reach without misgivings the conclusion that the Belt Line was negligent. Was Reynard also negligent? That matter was submitted to a jury, which found that he was not.

Reynard came into this yard from Hampton boulevard, and he took that path which led directly to his workmen. It is true that there were other paths between other tracks but none of them led to the place to which, as superintendent, paymaster and timekeeper, he must go. Had he taken another path he must have crossed other tracks to reach them, and had he been hit by a shifting engine, this inquiry would naturally have arisen: What was he doing there?

There were no rails east of the point at which he was struck. When a rail was thrown on one side of the car, the crew would move over to the other side and throw another rail, and then come back. According to the testimony of Foster, foreman for Shaner, five minutes or more would pass between the throwing of rails on the two sides; that is to say, if a rail was thrown on the path between Tracks 5 and 6, five or more minutes would pass before another rail was thrown on that path, although in the intervening time another rail would have been thrown on the

path on the other side. A rail was thrown by Track 6 just as Reynard reached the car from which it came, so that he must have been five minutes away from that point when the preceding rail was thrown. One walking at four miles an hour would have been 586 yards away when the preceding rail was thrown, and if he were walking at three, he would have been 440 yards away, or somewhere between twelve and eighteen hundred feet. There is evidence in the record which, if accepted, shows that men on the Track 5 side could not be seen until in the act of heaving a rail over it. As one witness expressed it, you could not see out of the car; it was too tall. What then was the situation: Reynard saw no activities as he approached, and there had been none which he could have seen within 1,200 feet and possibly within 1,800 feet from the point.

We have examined with care evidence dealing with advance information which Reynard had and have reached the conclusion that he had been told that rails were to be unloaded in this yard, but there is no evidence to show that he knew when or where that was to be done.

This is Shaner's evidence as to what was said by Reynard a short time before he died:

"Q. Was he conscious when you saw him?

"A. Yes, he was conscious.

"Q. He talked rationally, did he?

"A. Yes, sir.

"Q. Did he make any statement to you about the accident itself?

"A. No. The only thing he said was that a rail fell on him.

"Q. That was all he said?

"A. Outside of asking about how he felt and was he in much pain, or something like that.

"Q. Did he tell you that he expected the rail to be thrown on the other side at that time?

"A. I don't know whether that was talked about or not.

"Q. Mr. Shaner, refresh your recollection and see if you don't recollect that he said to you in substance that he knew

the rails were being unloaded, but that he expected the rail to be thrown on the other side of the car.

"A. It is possible that he could have said that; it is possible."

The most that this witness could on cross-examination be induced to say was, that such a statement was in substance made but he did not know by whom. It is argued that it could not have been made by others in the hospital room because none of them were present when the accident occurred. The accident had been widely discussed and was doubtless being discussed on that occasion, and it is not now possible to say definitely by whom such a statement, vaguely remembered, had been made. All of these were matters for the jury. We accept credible evidence which supports a verdict.

It is said that it is not necessary to take precautionary measures where the injury could not have been anticipated. A witness was asked:

"Q. This path that you say Mr. Reynard was on, had you seen other people use that path?

"A. Sure, we all walked up and down that way. There was no other way."

Moreover, as we have seen, precautionary measures were actually taken. The lookout did not look.

These cases, like most cases, turn upon the facts, and because they turn upon facts, those in which facts differ are not very helpful. It is for that reason, except when it is unsupported, we accept the findings of the jury.

The motion for judgment was brought in the name of T. Helm Jones, administrator of the estate of Albert H. Reynard. On motion of the defendant, the court ordered that the style of the plaintiff be amended to read: "T. Helm Jones, Administrator of the estate of Albert H. Reynard, and for the benefit of American Mutual Liability Ins. Co., as its interest may appear."

Counsel for the plaintiff, in the opening statement, said that it was for the benefit of the widow and son. That was the truth but not the whole truth; it was also for the benefit

of the insurance company. Ordinarily we keep from the jury the fact that the plaintiff was insured, but we are of opinion that one has a right to tell the jury what the record shows. It might be that a widow and child had received complete pecuniary compensation. In such circumstances it would not be fair to tell the jury that the action was for their benefit and so appeal to its sympathy. It should know the facts.

It was error to withhold this information from the jury, but it was incidental error and had little to do with the final judgment.

This instruction, No. 8, was given for the plaintiff over the defendant's objection:

"The court instructs the jury that Mr. Reynard was an invitee on the defendant's property and it was the duty of the defendant, through its agents, servants and employees in unloading rails from the gondola car to exercise ordinary care to keep an effective look out, *at the time the rail was thrown*, for persons who might be in a place of danger from falling rails, and if you believe from the evidence that the defendant failed to exercise such care to keep such an effective lookout, then the defendant was guilty of negligence, and if you believe from the evidence that such negligence was the proximate cause of the death of Mr. Reynard then you shall find for the plaintiff, unless you believe, by a preponderance of the evidence, that the plaintiff was also guilty of negligence."

Particular objection is made to the phrase which we have italicized. That assignment is not well taken, and for two reasons:

It came too late; it came after the jury had retired. To have called them back and to have stricken out "at the time the rail was thrown" would have said in substance to them that it was not necessary to exercise any care at that time. Certainly the jury might have so inferred.

As a matter of fact there was nothing wrong with it. The path was a traveled one. Those coming from the dock would have passed the Shaner workmen and would have been

made immediately aware of the situation. Those coming from the east would have passed no one but would have been in plain sight of Wilkins for an indefinite distance. Wilkins knew or should have known that this paymaster on Saturdays came to and settled with men on the job. He was, as we have seen, a part of the Shaner men assigned to this work. They had to go there and lay rails, and he had to go there and pay them off. As we have seen, it was the duty of Wilkins to keep a lookout and that duty he recognized. A lookout's duty is to look and to look at a time when looking will be effective. *Southern R. Co.* v. *Campbell,* 172 Va. 311, 1 S. E. (2d) 255, and *Virginian R. Co.* v. *Rodgers,* 170 Va. 581, 197 S. E. 476.

If Wilkins had looked down this walkway to the east he could not have failed to see Reynard. The plain fact is that he did not look. For all we know, he might have been looking at a flight of canvasbacks on their way to Back Bay. And in this connection we might say once and for all that the failure to note Reynard's approach was actionable negligence whether Reynard was an invitee or a licensee, and so this labyrinth of distinctions which we are invited to explore, in its application to existing conditions, is without value.

This instruction was tendered on behalf of the defendant:

"The court instructs the jury that it was the duty of Reynard to use ordinary care for his own safety, to look at and observe the existing conditions and the operations being carried on in the defendant's yard and to apply such knowledge as they believe from the evidence he had of the operations then in progress. Ordinary care is such care as a person of ordinary prudence similarly situated and having the same knowledge which you believe from the evidence Reynard had of the operations then going on would have been expected to use under the existing circumstances.

"If the jury believe from the evidence that Reynard failed to take such precautions and that by taking them he could have discovered that rails were being thrown from the work train of the defendant in time to have avoided the accident,

then he was guilty of negligence, and if such negligence on his part proximately contributed to the accident, they must find for the defendant, even though they may further believe from a preponderance of .the evidence that the defendant was also guilty of negligence."

It was amended and given in this form:

"The court instructs the jury that it was the duty of Reynard to use ordinary care for his own safety. Ordinary care is such care as a person of ordinary prudence similarly situated and having the same knowledge which you believe from the evidence Reynard had or should have had would have been expected to use under the existing circumstances.

"If the jury believe from the evidence that Reynard failed to exercise ordinary care, then he was guilty of negligence, and if such negligence on his part proximately contributed to the accident, they must find for the defendant, even though they may further believe from a preponderance of . the evidence that the defendant was also guilty of negligence."

This was taken out of the instruction, as offered: " * * * to look at and observe the existing conditions and the operations being carried on in the defendant's yard and to apply such knowledge as they believed from the evidence he had of the operations then in progress."

There were really no danger signals to put Reynard on notice. A jury should not be asked to search them out.

When we say that it is the duty of one to use ordinary care for his own safety and that ordinary care is such care as might be expected of a person of ordinary prudence in existing circumstances, we have defined the care which one must take for his own protection.

When it appears that such care was not taken and that such failure contributed substantially to the accident, we have covered this phase of the law of contributory negligence. Such additions as are made to this rule often arise from a disinclination to let well enough alone.

Defendant was guilty of negligence on its own showing.

The question of contributory negligence was submitted to a jury.

We have not undertaken to discuss conflicts in the testimony but have accepted, as we should accept, that which is not incredible and which was accepted by the jury. We find no reversible error in the record.

*Affirmed.*